MACY'S MISSOURI–KANSAS DIVISION, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

Amalgamated Clothing Workers of America, AFL–CIO, Intervenor.

No. 18699.

United States Court of Appeals Eighth Circuit.

Feb. 16, 1968.

Harry L. Browne and Jack L. Whitacre of Spencer, Fane, Britt & Browne, Kansas City, Mo., for petitioner.

John I. Taylor, Atty., N. L. R. B., Washington, D. C., for respondent; Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Herman M. Levy and George B. Driesen, Attys., N. L. R. B., were on the briefs.

Jacob Sheinkman, New York City, and John E. Philbin, Chicago, Ill., on brief for intervenor.

Before MEHAFFY and GIBSON, Circuit Judges, and STEPHENSON, District Judge.

FLOYD R. GIBSON, Circuit Judge.

This case is before us on a petition by an employer, Macy's Missouri-Kansas Division, to review a decision and order of the National Labor Relations Board. The Board cross-petitions for the enforcement of its order. The decision and order of the Board are reported at 162 N.L.R.B. No. 70.

Our original opinion in this case was withdrawn and Macy's Petition for a Rehearing was granted on the issue of a § 8(a) (5) violation, which in turn was concerned with the eligibility of permanent replacements for economic strikers to vote in a representation election where the economic strikers had returned to work and the strike was not current on the election date. This present opinion covers the issues decided in the original opinion and the modifications made thereon as a result of the rehearing.

Petitioner, Macy's is a division of a national retail organization engaging in the sale of merchandise through department stores. Macy's operates a main store in downtown Kansas City, Missouri, and four branch stores in the Kansas City metropolitan area.

These proceedings were originally initiated by the Amalgamated Clothing Workers of America, AFL-CIO (Union). The charges arose following the Union's attempt to organize employees of Macy's Ladies' Alteration Department beginning in August 1965. Based upon charges filed by the Union, the Board found that Macy's violated § 8(a) (1) of the National Labor Relations Act (29 U.S.C. § 158(a) (1)) by threatening employees and by promising and unilaterally granting certain wage increases. The Board found that by transferring Lydia Schmidt from the Ladies' Alteration Department to the Men's Alteration Department in its main store, Macy's had practiced unlawful discrimination in violation of § 8(a) (3) and (4) of the Act (29 U.S.C. § 158(a) (3) (4)). Finally, the Board found that Macy's refused to bargain with the Union after it had been duly certified as the exclusive bargaining representative of the ladies alteration employees in violation of § 8(a) (5) of the Act (29 U.S.C. § 158(a) (5)).[1]

The scope of our review is limited to a determination of whether the findings of the Board are supported by substantial evidence on the whole record. If the record discloses substantial evidence in support of the findings of an unfair labor practice, the order of the Board must be enforced. Universal Camera Corporation v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

---

1. The pertinent provisions of § 8(a) of the Act (29 U.S.C. § 158(a)) read:

"§ 158 Unfair Labor Practices

"(a) It shall be an unfair labor practice for an employer—

"(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in Section 157 of this title;

\* \* \* \* \*

"(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization; \* \* \*

"(4) to discharge or otherwise discriminate against an employee because he has filed charges or given testimony under this subchapter;

"(5) to refuse to bargain collectively with the representatives of his employees, \* \* \*."

With this in mind we examine each of the Board's findings.

## THREATS, PROMISES AND WAGE INCREASES IN VIOLATION OF § 8(a) (1)

Gertrude Cooper was the manager of Macy's main store Ladies' Alteration Department and was stipulated to be a supervisor within the meaning of 29 U.S.C. § 152(11). While Cooper was on vacation in August 1965 various employees in the department began supporting the Union and signed union cards. Upon her return Cooper made her dislike of unions known. We believe the totality of her expressions could validly be considered coercion, interference, and restraint of employees in the full exercise of their rights guaranteed under the Act.

On numerous occasions Cooper discussed the Union with employee Ola Franklin. Cooper asked why the employees had contacted the Union and indicated the employees would be better off without a union. Later she stated that the girls were "kind of stupid because there would be layoffs." Cooper indicated that if the employees supported the Union the company might decide not to do the alteration work on the Trans-World Airlines uniforms as contracted and there would be layoffs. On another occasion Supervisor Cooper advised employee Franklin that she "would be better off if * * * [she] let the union go" as she was not "indispensable".

Supervisor Cooper questioned employee Hinman as to why the girls had joined the Union and complained that the girls had gone behind her back to sign the cards. She berated a fellow employee of Hinman, one Lydia Schmidt, as being the instigator of the Union and told Hinman that Schmidt was the "biggest troublemaker in that department."

Cooper told employee Zagar that she had been "stabbed in the back" by the employees. Cooper said that a union would bring about layoffs in slack times, and that had there been a union they probably wouldn't have gotten the TWA contract.

Cooper approached employee Jakofcich and asked her what she thought about the Union. Later Cooper remarked that there might be layoffs in the future and that the company might not want the TWA contract. Cooper indicated that Jakofcich would be the third in line for layoff.

In summary, on at least five occasions it appears that Cooper threatened employees with possible layoff, and, at least by intimation, placed the blame for such layoff on the Union. Cooper was obviously angry at the employees who were supporting the Union and repeatedly indicated that she had been stabbed in the back and betrayed by these employees. She interrogated employees and vilified to others an employee who was a leader in the unionization drive. Finally, on at least one occasion Cooper intimated that an employee would be fired if she did not cease her union activity.

Though not disputing the statements made by Cooper, Macy's contends that the statements were but mild expressions of opinion protected by the right of free speech. We cannot agree. These were clearly coercive remarks, repeatedly made during the course of an organization drive. In their totality these statements constitute what could be considered coercive activity in violation of § 8(a) (1) of the Act. Jas. H. Matthews & Co. v. N. L. R. B., 354 F.2d 432, 439–440 (8 Cir. 1965), cert. denied 384 U.S. 1002, 86 S.Ct. 1924, 16 L.Ed.2d 1015 (1966); N. L. R. B. v. Byrds Manufacturing Corp., 324 F.2d 329 (8 Cir. 1963).

In addition to these threats Cooper made certain promises of benefits. It has often been held that promises of benefit that are calculated to induce employees to forsake the union are unfair labor practices in violation of § 8(a) (1). N. L. R. B. v. Grand Foundries, Inc., 362 F.2d 702, 708 (8 Cir. 1966); N. L. R. B. v. Soft Water Laundry, Inc., 346 F.2d 930 (5 Cir. 1965).

The evidence indicates that Cooper told employee Franklin that she couldn't do anything about wages at

that time "but later on maybe she could do something." Cooper told employee Hinman that the Union couldn't do anything for the employees that Macy's couldn't do. To employee Butler, Cooper said, "If you will just trust me, Macy's will do more for you than the union."

Though the Board has certainly not made a strong showing that these statements were unfair inducements, we think that taken in the context of the unionization drive, the strong contemporaneous expressions of antiunion sentiment, and the wage increases that were subsequently granted, these statements are a sufficient promise of reward to constitute an unfair labor practice in violation of § 8(a) (1).

█ In addition to the threats and promises the Board found that the granting of $5 to $7 wage increases to three employees were made to discourage union membership in violation of § 8(a) (1). The evidence indicates that these raises amounted to about a 10 per cent to 15 per cent increase in salary and were two to three times the average periodic increase.

Macy's argued that these increases were an attempt to keep the salary spreads of senior workers in line with the new minimum wage required to be paid to new workers. The trial examiner was not impressed with this explanation,[2] and pointed to the "meteoric raise" in pay scale enjoyed by Harris and Wood that gave them two substantial wage increases within six months. The trial examiner also pointed to the unusual timing of the raises that coincided with the unionization drive and followed assurances from Cooper that Macy's would take care of the employees. Though the employer has presented a plausible justification for the wage increases, we think the Board was presented with a factual

issue which was resolved in favor of the General Counsel. As such we believe the finding, having substantial support in the record, is entitled to acceptance by us. Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 490, 71 S.Ct. 456, 95 L. Ed. 456 (1951).

█ It is well established that the timely and unilateral granting of a wage increase is an unfair labor practice when it results in employees being induced to forsake the union. "[I]nterferences, accomplished by allurements, are as much condemned by the Act as is coercion." N. L. R. B. v. Douglas and Lomason Company, 333 F.2d 510, 514 (8 Cir. 1964). See also, N. L. R. B. v. Exchange Parts Co., 375 U.S. 405, 409–410, 84 S.Ct. 457, 11 L.Ed.2d 435 (1964).

### TRANSFER OF SCHMIDT

On October 7, 1965, employee Lydia Schmidt was transferred from the Ladies' Alteration Department where she was "lead fitter" to the Men's Alteration Department. Schmidt was a leading proponent of the Union in her department, a fact known to Macy's. The Board found that Macy's transferred Schmidt to the Men's Alteration Department because of her union activities and because of testimony given during prior Board proceedings.

█ In determining if a transfer constitutes discrimination in violation of § 8(a) (3) and (4) we start with the proposition that an employer has a fundamental right to assign employees to positions the employer deems, in the exercise of its managerial discretion, most expedient. The employer generally is allowed to pick the time, place, and manner of employment, and absent contractual restrictions the employee is required to conform with these requirements. See,

---

2. The Board here argues that the Fair Labor Standards Act, setting forth federal minimum wages, was not applicable to Macy's during the year in question. Though we have not pursued the matter thoroughly, we believe the Board is mistaken. However, it does not appear that the trial examiner considered the alleged inapplicability of the Fair Labor Standards Act in his finding of unfair inducement. Rather, his decision was clearly based upon the various competing factors. Thus, any mistake of law on this point by the Board does not appear to have influenced or tainted its initial resolving of this factual issue against the petitioner.

N. L. R. B. v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893 (1937); CCH Labor Law Reporter, § 4010 and § 4095 et seq. Only if the Board is able to prove that the particular assignment was brought about because an employee exercised his rights guaranteed by the Act will an employer's work assignment be declared illegal.

█ It is well established, as the Board admits, that the mere coincidence of an employee's union activity and the employee's transfer will not support a charge of discrimination. Beaver Valley Canning Company v. N. L. R. B., 332 F. 2d 429 (8 Cir. 1964). Aside from this coincidence, however, the only positive evidence supporting the Board's finding of discrimination is the fact that Schmidt's immediate supervisor was very unhappy about Schmidt's union activity. Though this is some evidence of discrimination, when viewed in the light of the strong conflicting evidence, we do not believe it is sufficient to support the Board's finding.

To begin, the transfer was not a demotion. Schmidt would receive a higher salary in her new position, and there is nothing to indicate that the work was any less desirable. Schmidt was not deprived of being a member of this Union as the department to which she was transferred was represented by the same Union. Further, other than Cooper's private reaction to the Union there is no particular indication of anti-union animus coming from the company's management. There are unions representing various groups of Macy's employees. On the occasion of this particular campaign the company did not engage in any form of anti-union propaganda or campaigning.

Even more importantly, these undisputed facts appear on the record. In May or June of 1965, long before the union organization drive, it was decided that the position of "cashier-wrapper" in the Men's Clothing and Alterations Department was uneconomical and should be eliminated. To do this it was decided to have the salesmen on the floor do their own cashiering and have a single employee handle "send and take" customers, assist the manager with his paper work, and assist the finishers in Men's Alterations. This readjustment would eliminate the position of a part-time finisher and eliminate the uneconomical spare time formerly experienced by the "cashier-wrapper." This was not an unusual step, but was one being followed in other departments. The problem now facing management was finding a person with the qualifications necessary for the job. The employee would have to have customer contact ability, a knowledge of the necessary paper work to assist the manager, and have experience in alterations. Thus, it is clear that this job was not arbitrarily created to siphon away union leaders from other departments. Nor was it a job that could be easily filled by an unskilled employee.

Even after Macy's reached the decision to reorganize, Schmidt was not immediately or arbitrarily transferred. This, in itself, indicates absence of an illegal motive. First, the Union was contacted. They were asked to furnish a person capable of filling this new position. The Union was unable to locate a suitable person. As Schmidt had previously asked to be transferred to Men's Alterations and as she had all the necessary qualifications, she was approached. She turned down the offer. Other employees were then offered the job. None accepted. Finally, apparently as a last resort, Schmidt was ordered transferred. Under the circumstances we believe the employer had a right to make this move.

█ The Board makes much of the fact that Ladies' Alterations from which Schmidt was transferred was busier than Men's Alterations. Though it is possible to prove unfair labor practices by negative proof, we do not believe that this bit of evidence is persuasive. The volume of business in Ladies' Alterations would seem to have little relationship to the decision to streamline operations in another department. Macy's repeatedly indicated that it is much easier to fill positions in Ladies' Alterations than it

would be to fill the position to which Schmidt was transferred. It is obvious that the position Schmidt was being asked to fill would require experience in Macy's accounting procedure, an ability to meet customers and skill in alteration. That type of person could not easily be recruited.

Thus, we have a transfer supported by extremely strong evidence which indicates that the employer, prior to the unionization drive, had decided for sound reasons of efficiency to create a new position, and thereafter decided for equally sound reasons to transfer this particular employee to that position. The Board has only brought forth the weakest of evidence indicating discrimination. So weak is the Board's evidence, when viewed on the whole record, its decision and order finding the transfer of Schmidt to be discriminatory is not entitled to enforcement.

Were we to uphold the Board on this issue, the historical rights of an employer to transfer employees as efficiency demands would almost be eliminated. Once an employee became an active supporter of a union he would remain virtually immune from the directions of his employer. Obviously, such is not, nor should it be, the law. N. L. R. B. v. Louisiana Manufacturing Company, 374 F.2d 696, 706 (8 Cir. 1967). To overcome the inherent right of an employer to assign work to his employees, the Board must make a stronger showing of discrimination than it has shown here.

### REFUSAL TO BARGAIN

Macy's refusal to bargain with the Union after the representation election, contending that the election was illegal in that three permanent replacements for the economic strikers were disenfranchised by the Regional Director's order. Macy's felt particularly aggrieved because its request for review of that order was summarily denied and Macy's was not accorded any opportunity to present this issue to the Board.

Chronologically: On August 18, 1965 the Union filed a petition requesting a representation election among Macy's Ladies' Alteration employees. On September 23, the Regional Director issued his decision dismissing certain objections by Macy's and directing an election in the unit. The payroll eligibility period was the payroll period ending September 16, 1965. While the Regional Director's order was before the Board on request for review, the Union demanded from Macy's immediate recognition or a consent election. Macy's refused and on October 16, five of the employees in the unit and Lydia Schmidt went on strike. A few days later, on about October 18, replacement Garcia was hired; on about October 28, replacement Young was hired, and replacement Ramsey, who was hired late in September 1965 for work in another department, was transferred during this same period to the Ladies' Alteration unit. The newly hired employees, Garcia, Young and Ramsey, were told they were permanent replacements for the economic strikers, and the Union and Regional Director's office were also so informed. On November 1, 1965 the Union filed unfair labor practice charges. The strike ended on November 23, 1965. Macy's retained all three of the replacement employees and the strikers were reinstated without penalty. The representation election was held on January 28, 1966. The votes of the replacement workers, Garcia, Young and Ramsey, were challenged by the Union. As the vote was 7 for the Union and 5 against without considering the challenged votes, the three challenged votes could be determinative of the outcome. The Regional Director refused to count their votes on the ground that the employees were not employed during the payroll eligibility period. The Union was certified as the exclusive bargaining agent for the employees in the unit. Macy's requested review, but the request was denied by the Board "as raising no substantial issue warranting review."

On March 23, 1966, Macy's refused to bargain with the Union asserting that Garcia, Ramsey and Young were entitled to vote in the certification election. Because they were denied this right and their votes might have been determina-

tive of the election's outcome, Macy's alleged that the election did not properly certify the Union. Following the charges that resulted from this refusal to bargain, the trial examiner held that he was bound by the Board's earlier finding of the election's validity and ruled that Macy's refusal to bargain violated § 8 (a) (5) of the Act. The Board affirmed the action of the trial examiner.

Since Macy's admits it has refused to bargain because of the asserted illegality of the election, the sole issue for our determination on this point is whether Garcia, Young and Ramsey were improperly deprived of their right to vote in a certification election; if they were, the election was not representative and Macy's would not be required to bargain with the Union. However, if the Board's decision is warranted under the law, the results of the election would justify certification and Macy's would be required to bargain with the Union.

The National Labor Relations Act confers on the Board a broad mandate to establish rules governing the conduct of elections. 29 U.S.C. §§ 153(b), 159(b) (c) and (e). The Supreme Court in N. L. R. B. v. A. J. Tower Co., 329 U.S. 324, 330–331, 67 S.Ct. 324, 328, 91 L.Ed. 322 (1946) stated:

"As we noted before, Congress has entrusted the Board with a wide degree of discretion in establishing the procedure and safeguards necessary to insure the fair and free choice of bargaining representatives by employees. * * * [T]he Act authorizes the Board to 'take a secret ballot of employees or utilize any other suitable method to ascertain such representatives.' In carrying out this task, of course, the Board must act so as to give effect to the principle of majority rule * * *. It is within this democratic framework that the Board must adopt policies and promulgate rules and regulations in order that employees' votes may be recorded accurately, efficiently and speedily.

"The principle of majority rule, however, does not foreclose practical adjustments designed to protect the election machinery from the ever-present dangers of abuse and fraud. Indeed, unless such adjustments are made, the democratic process may be perverted and the election may fail to reflect the will of the majority of the electorate."

See N. L. R. B. v. Blades Manufacturing Corp., 344 F.2d 998 (8 Cir. 1965); N. L. R. B. v. Sun Drug Co., 359 F.2d 408 (3 Cir. 1966).

In the exercise of its general rule-making power over elections the Board has long required, as a general rule, that for one to be able to vote in a representation election, the person must be employed during the established payroll eligibility period and must also be employed on the day of the election. Wayne Knitting Mills, Inc., 1 N.L.R.B. 53 (1935); American Shuffleboard Co., 85 N.L.R.B. 51 (1949); Gulf States Asphalt Co., 106 N.L.R.B. 1212 (1953). In the case now before us, the three new employees were admittedly not employed during the payroll eligibility period, and thus under the well established general requirements would not be entitled to vote. General Electric Co., 114 N.L.R.B. 10 (1955).

While apparently conceding the Board's broad power in this area and recognizing the general rule requiring voter eligibility, Macy's contends that there is an established exception to the rule which provides that a person initially hired as a replacement for an economic striker has an absolute right to vote in representation elections regardless of payroll eligibility dates or the return of striking workers before the election day.

In administering the National Labor Relations Act we recognize the Board's broad authority to establish the procedure and standards for a free and fair representation election. N. L. R. B. v. A. J. Tower, Co., supra; Cone Brothers Contracting Co. v. N. L. R. B., 235 F. 2d 37 (5 Cir. 1956) However, the resolving of voting rights in connection with an economic strike has proven to be a difficult and perplexing chore. All workers, of course, have an economic and

personal interest in their jobs and in the outcome of a representation election. This includes both the economic strikers and their replacements. The balancing of interests and equities between these two groups has been beset with some confusion and contradiction, both on the part of the Board and of Congress. This statement is not made in any derogatory sense whatsoever but only to illustrate the difficulty and confusion surrounding the basic problem.

The Board in 1941 in The Rudolph Wurlitzer Company, 32 N.L.R.B. 163 (1941), recognized that persons hired to replace striking employees were eligible to vote on the theory that they were "employees" within the meaning of § 2(3) of the Wagner Act. Chairman Millis in a supplemental concurring opinion said "In purely economic strikes, the employer and the striking employees should have equal rights; the Board should be neutral."

The Board in The Pipe Machinery Company, 76 N.L.R.B. 247 (1948) held that during an economic strike, the current payroll determined eligibility, and all strikers, and all workers hired since the date of strike were eligible to vote, subject to challenge for cause. It thus appears that workers hired to replace striking employees are recognized as both employees and of a class having a legitimate interest in the resolvement of industrial disputes.

Congress then in 1947 enacted the Taft-Hartley Act, which in § 9(c) (3), denied employees on strike who were not entitled to reinstatement the right to vote. This congressional policy was changed in 1959 when Congress amended § 9(c) (3) of the Taft-Hartley Act to give permanently replaced economic strikers, who otherwise qualified, the right to vote in an election held within twelve months of the date of the strike. Nothing was indicated by this amendment of any intention to change the status of workers hired as replacements. In W. Wilton Wood, Inc., 127 N.L.R.B. 1675, 1680 (1960) the Board considered and rejected the Union's argument that re-

placement workers for economic strikers were not eligible to vote, with the following analysis and observation:

"There was never any specific reference in the Act to the voting eligibility of replacements for economic strikers. Prior to the Taft-Hartley amendments, replacements were permitted to vote under the Board's *Wurlitzer* policy. They were also found to be eligible under the Taft-Hartley amendments. It cannot reasonably be inferred, therefore, that Congress intended, as an incident to the new provision granting limited eligibility to economic strikers, to disenfranchise replacements. Any doubt on this score is removed by the legislative history of the current provision. In the discussion of the proposed amendment to Section 9(c) (3) of the Act in S. 1555 on the floor of the Senate, Senator Javits, one of the bill's sponsors, stated that the proposed amendment 'allows both the economic striker and the one who has filled his job to vote.' We shall, therefore, permit permanent replacements for economic strikers to vote in Board elections."

The Board then in Tampa Sand and Material Company, 129 N.L.R.B. 1273 (1961) made an exception to its general rule that workers to be eligible to vote must have been employed both on the initial eligibility date and the date of election and allowed permanent replacements for economic strikers to vote, even though the permanent replacements were not employed on the eligibility date. This was done for the stated reason that the strike had occurred after the direction of the election and the employer had no chance to hire permanent replacements before the eligibility date and for the further reason that to disenfranchise permanent replacements under the Board's general eligibility rule did not correspond to the policy of the National Labor Relations Act as amended in 1959 to permit economic strikers to vote. The Board limited the number of permanent replacement workers eligible to vote to a number not in excess of the number of

economic strikers. The Board's reasoning is set forth at pp. 1274–1275:

"However, the established general eligibility period was not necessarily controlling as to the replacements, for the Board's direction specifically provided without qualification that strikers and their replacements could vote under challenge. This was done to enable the Board to consider on an *ad hoc* basis specific and unforeseeable issues involving the eligibility of both classes of employees.

"In the instant case, we are presented with the unusual situation of a strike arising after issuance of the direction of election, and as a result the replacements for the strikers, although hired before the election, were not employed during the established eligibility period. To disenfranchise these replacements under our general eligibility rule would, in our opinion, not comport with the policy of the Act, as recently amended. Prior thereto, replaced economic strikers were not eligible to vote as a matter of law; while their permanent replacements were permitted to vote. To eliminate such voting imbalance between these two groups of employees, who would vie after the strike for the same jobs, Section 9(c) was specifically amended so as to permit replaced economic strikers to vote. We are satisfied that this statutory scheme contemplated a corresponding right of replacements to vote without regard to the eligibility period established for other employees. Indeed, the facts in this case reveal that any other view would sanction, in reverse, the kind of imbalance which the amendment sought to eliminate. Accordingly, we hold that permanent replacements for strikers, who in no event may exceed the number of strikers, are eligible to vote if employed on the date of the election."

The Board then in Greenspan Engraving Corporation, 137 N.L.R.B. 135 (1962), by a divided vote (3–2) refused to follow *Tampa Sand* and apply its doctrine of eligibility to a factual situation where the economic strike preceded the direction of election. In *Greenspan* the Regional Director relying upon the eligibility rule established in *Tampa Sand* found that those workers hired subsequent to the eligibility period as replacements were employed on the day of election and were, therefore, eligible voters. The Board reversed the Regional Director and narrowed the scope of its *Tampa Sand* ruling, holding:

"In accordance with the Petitioner's request, we have reconsidered the holding of *Tampa Sand*. We are now persuaded that, insofar as that case extends eligibility to replacements hired between the eligibility date and the election date, without regard to any other circumstances, it constitutes an unwarranted departure from the Board's usual eligibility rules.

\*  \*  \*  \*  \*  \*

"While it was thus within the Board's power to adopt the rule of *Tampa Sand*, we believe it appropriate to limit the holding of that case to the facts there present." [3]

3. The Board in *Greenspan* reviewed the rights of replacements, in the following significant language, at pp. 17,774–75, 1962 CCH, NLRB:

"The right of permanent replacements for economic strikers to vote in representation elections has long been recognized. However, at all times prior to *Tampa Sand*, the Board determined the eligibility of such permanent replacements by applying its general rule that, to be eligible, an employee must be employed during the eligibility payroll period and on the date of the election. At no time was any disapproval expressed by Congress or the courts of the Board's application of this eligibility rule to such striker replacements, but Congress did disagree with the Board insofar as it permitted replaced economic strikers to cast ballots although they were not entitled to reinstatement. Accordingly, in 1947, Congress amended the Act by adding Section 9(c) (3), which provided that 'Employees on strike who are not entitled to reinstatement shall not be eligible to vote.' This amendment was concerned solely with the voting rights of economic strikers and was not

Macy's contends that *Tampa Sand* absolutely establishes the right of the three new workers to vote in the representation election. We are not sure that it does but on the other hand there is considerable force to Macy's argument, and we feel this matter is of sufficient importance to merit consideration by the Board. The Board then could articulate its reasons for distinguishing the case at bar from that of *Tampa Sand*, if it thinks it is distinguishable and should be accorded different treatment than *Tampa Sand*.

In a situation of this type we think Macy's should have an opportunity to present its case to the Board and be afforded a full hearing, instead of receiving a summary rejection of its claim based upon the Regional Director's administrative finding. In a somewhat similar situation where the Board refused the objecting party a hearing on its objection in connection with a representation election the Fifth Circuit in N. L. R. B. v. LaMar Electric Membership Corporation, 362 F.2d 505 (5 Cir. 1966) set aside the Board's order and remanded the case to the Board for a hearing, commenting on the Board's action thusly, at 508:

> "This treatment of the matter by the Regional Director would obviate the necessity of ever having a hearing on objections to an election. The disputed facts were resolved without testimony under oath, without cross-examination, and without the procedural safeguards of a hearing."

The difficulty here arises on the impact of the Board's opinion in *Greenspan* on *Tampa Sand*. The Board confined the eligibility standards adopted in *Tampa Sand* to the facts then before the Board and held that *Tampa Sand* insofar as that case extends eligibility to replacements hired between the eligibility date and the election date, without regard to any other circumstances, constitutes unwarranted departure from the Board's usual eligibility rules. But in a discussion of that issue in *Greenspan* the Board stressed the fact "In that case the strike arose AFTER the issuance of the Direction of Election, and it was, therefore, patently impossible for the Employer to hire replacements prior to the eligibility cut-off date." The Board emphasized the time of strike as controlling and made no mention of the currency of the strike as being significant. The Board articulated its reasons, stating that a strict application of the Board's usual eligibility standards in *Tampa Sand* would create a vote imbalance between the economic strikers and their replacements. It treated *Tampa Sand* as an unusual situation and held that where the strike began before the election was directed, the usual eligibility standards, requiring employment on the eligibility cutoff date, would be applied. It further remarked that it could see no reason why striker replacements hired after the eligibility date were entitled to more favored treatment than would be accorded regular employees hired during a comparable period where there was no strike involved. The majority of the Board then concluded "We therefore adhere to *Tampa Sand* where, as there, a strike occurs after the eligibility date and we adhere to our usual eligibility rules with respect to the eligibility of replacements for economic strikers in all other situations."[4]

intended or construed to affect the established eligibility requirements for replacements. In 1959, because of dissatisfaction with the impact of Section 9(c) (3) on the economic strikers themselves, that Section was amended to provide that 'Employees engaged in an economic strike who are not entitled to reinstatement shall be eligible to vote under such regulations as the Board shall find are consistent with the purposes and provisions of this Act in any election conducted within twelve months after the commencement of the strike.' Again Congress was concerned solely with the rights of economic strikers. It is clear from the legislative history that this is so and that the amendment had no impact on the eligibility of permanent replacements, * * *."

4. A strong dissent was written by two members of the Board in *Greenspan* advocating a broader application of the

The Board contends in the case at bar that *Tampa Sand* is not applicable as the strike had been concluded and the strikers returned to their jobs without penalty. It, therefore, viewed the new workers, originally hired as replacements, as additions to the work force and then points out the distinction from *Tampa Sand* that the strike was not current on the date of election. This is a distinction differentiating the case at bar from both *Tampa Sand* and *Greenspan* but the Board in restricting the full import of *Tampa Sand* in *Greenspan* only made note of the differentiating factual situation of the strike in *Greenspan* being called before the direction of election and made no mention of the currency of the strike being an issue. Of course, in both *Tampa Sand* and *Greenspan* the strike was current on the election date. Macy's argues that the currency of the strike on election day has no legal significance as it has no effect on the voting majority or on the number of employees who have an interest and a lawful claim to their jobs, and further argues that it should not be penalized because it decided to end industrial strife and accept the strikers back in settlement of the strike.

■ In our first opinion, since withdrawn after Macy's Petition for a Rehearing was granted on this issue, we thought that the Board's decision should be enforced in view of its broad discretion to determine appropriate units for collective bargaining purposes under § 9 (b) of the Act. Packard Motor Car Co. v. N. L. R. B., 330 U.S. 485, 67 S.Ct. 789, 91 L.Ed. 1040 (1947). However, in view of the fact that the Board did not afford the employer Macy's a hearing on this issue and in view of the fact the determination in *Greenspan* restricting *Tampa Sand* did not touch upon the issue of the currency of a strike, we think the Board should as a matter of fair procedure afford the objecting party an opportunity to be heard. In its expertise, it should decide whether the doctrine of *Tampa Sand* covers the case at bar, and articulate its reasoning on that issue.

We are of the opinion that consideration should be given to the rights of permanent replacements for economic strikers, even when the economic strikers have been returned to their jobs; otherwise, employers would be encouraged to foment industrial strife by prolonging an economic strike. Employers should not be penalized in their efforts to minimize industrial strife by settling strikes. Both the economic strikers and the permanent replacements have a legitimate interest in their jobs and in any representation election held in connection therewith. These are matters for Board consideration and undoubtedly there may be other considerations not noted by us.

We think, also, that the matter of voter eligibility rests primarily with the Board and that in its expertise and experience in handling labor-management relations, it should decide this issue, subject, of course, to right of review. We therefore, refuse enforcement of the Board's order finding a violation of § 8(a) (5) of the Act at this time and remand this issue to the Board for hearing and for further proceedings consistent with this opinion.

*Tampa Sand* holding. They reasoned: " * * * there was implicit Congressional approval of the Board's earlier practice of allowing permanent replacements for economic strikers to vote in an election." They further noted that the 1947 amendment that disenfranchised economic strikers who were not entitled to reinstatement, and the 1959 amendment giving permanently replaced economic strikers the right to vote under limited circumstances was not intended to and did not affect the voting rights of their replacements. In conclusion they said:

"We believe that the *Tampa Sand* doctrine is sound; that in the context of an economic strike, both the strikers and their replacements should be entitled to vote, without regard to the general eligibility period.
 * * * * *
" * * * In sum, the *Tampa Sand* doctrine was adopted to insure that in a strike situation neither the employer nor the union would benefit in the election from the bare fact of the strike,— rather, that both the strikers and their replacements would be eligible, thereby balancing the interest of both groups."

In accordance with the views expressed herein the decision and order of the Board in finding that Macy's violated § 8(a) (1) of the Act by threatening employees and by promising and unilaterally granting certain wage increases is ordered enforced. That part of the order pertaining to the transfer of Schmidt is denied enforcement and the issue of an 8(a) (5) violation of refusal to bargain is remanded to the Board for a hearing.

Enforced in part, denied in part and remanded.