**NATIONAL LABOR RELATIONS
BOARD, Petitioner,**

v.

**SPOTLIGHT COMPANY, Inc.,
Respondent.**

**No. 20549.**

United States Court of Appeals,
Eighth Circuit.

April 1, 1971:

Rehearing Denied May 10, 1971.

Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Allison W. Brown, Jr., Michael S. Winer, Attys., N.L.R.B., Washington, D. C., for petitioner.

Smith, Williams, Friday & Bowen, James W. Moore, Little Rock, Ark., for respondent.

Before VAN OOSTERHOUT, GIBSON and LAY, Circuit Judges.

GIBSON, Circuit Judge.

The National Labor Relations Board petitions, pursuant to § 10(e) of the National Labor Relations Act as amended, 29 U.S.C. § 160(e), for enforcement of its Order issued on March 11, 1970, against respondent Spotlight Company, Inc. The Company is engaged in the manufacturing of lingerie and the alleged unfair labor practices occurred at its Ashdown, Arkansas plant. No jurisdictional issue is presented.

The Board's decision and Order are reported at 181 N.L.R.B. No. 94. The Board found that the Company violated § 8(a) (1) of the Act by coercively interrogating employees concerning their union activities, by requesting employees to engage in anti-union activity and soliciting employees to sign anti-union petitions, by threatening employees with reprisals including loss of work and plant closure for engaging in union activities, and by promising them benefits if they refrained from union activities. The Board further found that the Company violated §§ 8(a) (3) and (1) of the Act, 29 U.S.C. §§ 158(a) (3) and (1),

by laying off employee Kay McElhannon and by discharging employees Nina Jean Greene, Patricia Chafin, Leona Altenbaumer, Mary Lou Mears and Ethel Mears because of their union activities.

### THE § 8(a) (1) VIOLATIONS

The Union [1] organizational campaign began in April 1969.[2] The Company actively resisted the unionization effort, which it had a right to do, but in so doing exceeded the permissible bounds of free speech under § 8(c) of the Act.

■■■ Substantial evidence exists in the record to support the § 8(a) (1) violations found by the Board. It is clear that a company violates § 8(a) (1) by making promises of benefit if employees forsake the union,[3] by threatening reprisals such as plant closure or loss of work if they do not,[4] by appealing to employees to engage in anti-union activity and to sign an anti-union petition,[5] and by coercively interrogating employees during the organizational campaign.[6] On seven occasions in a seven-week period during the height of the union organizational drive, involving at least six employees, the Company made two unlawful threats, three coercive interrogations, one promise of benefits, and two solicitations of anti-union activity by employees. In view of the Company's evident anti-union animus and the evidence documenting the various acts of unlawful discrimination, we must enforce the Board's findings that the Company violated § 8(a) (1) of the Act.

### THE §§ 8(a) (3) and (1)

### VIOLATIONS

A. The layoff of Kay McElhannon.

On April 25, the day after the Union's first organizational meeting and its first handbilling at the plant, Plant Manager Paul Leiby sent employee Kay McElhannon home after he observed her (with Union cards in hand) joking with three other employees about the Union's campaign just prior to the morning work period. The Company argues that while an employee may in general have a right to distribute union literature during non-working hours in a non-working area regardless of company rules, its rule confining such activities to the lunchroom was reasonable because it was necessary to prevent chaotic conditions in crowded working areas and concomitant interference with production.

■■ We are not persuaded. It is well settled that the National Labor Relations Act protects the right of employees during non-working time to solicit union membership on company property unless the employer can demonstrate the restriction of that right is justified in order to maintain production or discipline. Republic Aviation Corp. v. NLRB, 324 U.S. 793, 803 n. 10, 65 S. Ct. 982, 89 L.Ed. 1372 (1945); NLRB v.

---

1. International Ladies Garment Workers' Union, AFL–CIO.

2. All dates are 1969 unless otherwise specified.

3. Macy's Missouri-Kansas Division v. NLRB, 389 F.2d 835, 838–839 (8th Cir. 1968); NLRB v. Louisiana Mfg. Co., 374 F.2d 696, 701 (8th Cir. 1967).

4. Macy's, 389 F.2d at 838; NLRB v. Arkansas Grain Corp., 390 F.2d 824, 826 (8th Cir. 1968).

5. NLRB v. Ace Comb Co., 342 F.2d 841, 843–844 (8th Cir. 1965); Bauer Welding & Metal Fabricators, Inc. v. NLRB, 358 F.2d 766, 772 (8th Cir. 1966).

6. Interrogations of employees Leona Altenbaumer and Ruby Hedrick by Plant Manager Paul Leiby and the interrogation of employee Betty Gentry by Floorlady Lucille Sample were coercive. Although Leiby did tell Altenbaumer that attendance at union meetings was her privilege following his query, the other interrogations contained no assurances against reprisals. The lack of such assurances coupled with the Company's anti-union animus and its failure to show any legitimate purpose for the questioning adequately supports the Board's finding of coerciveness. See NLRB v. Little Rock Downtowner, Inc., 414 F.2d 1084, 1093 (8th Cir. 1969); NLRB v. Ritchie Mfg. Co., 354 F.2d 90, 99 (8th Cir. 1965); NLRB v. Louisiana Mfg. Co., 374 F.2d 696, 700–701 (8th Cir. 1967).

Babcock & Wilcox Co., 351 U.S. 105, 113, 76 S.Ct. 679, 100 L.Ed. 975 (1956). The circumstances present here did not justify laying McElhannon off for engaging in solicitation during non-working time. The Board's finding of §§ 8(a) (3) and (1) violations will be enforced as to Kay McElhannon.

**B. The Discharge of Nina Jean Greene.**

Leiby granted Nina Jean Greene, a binder with three years' experience, a month's leave of absence to be with her son who was returning from Vietnam. When Greene went on leave on May 1, there were approximately twenty binders at work. While on leave Greene became a member of the Union's organizing committee.

On May 26, Greene returned to the plant to inform the Company that she would like to return to work about the end of May. Leiby informed her that work was slow and he did not know when she could return to work. There were ten or twelve binders working at the time and, in keeping with Company policy, there was one binder in training. Greene was recalled to work on August 13, five days after the NLRB complaint was issued on August 8.

The Board concluded that Greene was refused permission to return to work in June on account of her union activities. The Board reasoned that the Company's explanation that a work shortage prevented it from recalling Greene was inconsistent with its normal practice of rotating work during slack periods and the fact that 25 to 30 new employees were hired from May to September 1969.

■ We disagree. The evidence reflects that the binding section had been cut back during May due to a lack of summer business. The fact that the trainee binder was not laid off in deference to Greene is not evidence of discrimination because it is undisputed that the Company kept at least one trainee on the payroll for every section at all times.

The record reflects that the critical factors in the Company's decision not to recall Greene immediately were the cutback in her section due to a lack of work and Greene's low production record. Nonetheless, when business picked up in August, the laid-off binders were recalled to work, including Greene. We conclude that the Board's Order, lacking substantial evidence on the record, should not be enforced as to Greene.

**C. The Discharge of Patricia Chafin.**

Patricia Chafin, a member of the Union organizing committee and an active Union campaigner, requested a one-month leave of absence from her floor-girl Ruth Fields so that she could accompany her husband back to his home in North Carolina where he intended to work while awaiting an arbitrator's decision on his aggrieved discharge from an Ashdown paper mill. Before leaving town on May 13, Chafin telephoned Fields at home and the latter assertedly told Chafin that her request had been approved. When Chafin sought to return to work on May 26, she got a negative reply from Leiby who told her that work was slow but that there was a possibility she would be called back when it picked up. Leiby testified he also told Chafin that he had never approved a leave of absence for her. Chafin had not been recalled as of July 22 when she had the Union file an unfair labor practice charge with the Board.

The Company contends that Chafin's credibility was impeached by prior inconsistent statements she gave the Board and the Arkansas Unemployment Office. The Company points particularly to Chafin's July 17 application for state unemployment compensation which stated that "I guess I quit when I left without a leave of absence granted by Mr. Leiby." It is contended that since Chafin was not granted a leave and considered herself as having quit, the Company was under no obligation to immediately recall her when her return coincided with its slow summer season.

■ While we think that there is some doubt as to whether Chafin was given permission to leave and that Chafin's credibility has been placed in question, there is substantial evidence to support the Board's decision. The court of appeals may not "displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*." NLRB v. Walton Mfg. Co., 369 U.S. 404, 405, 82 S.Ct. 853, 854, 7 L.Ed.2d 829 (1962), quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951). The following facts constitute substantial evidence in this case. Chafin, a good producer, was a known member of the Union organizing committee, and was gone only two weeks and for a valid reason. She should have been recalled when her former position became available. Instead, 25 to 30 new employees were hired during the summer months while Chafin, an established good worker, was not recalled. We enforce the Board's finding of §§ 8(a) (3) and (1) violations. However, before the loss of pay suffered by Chafin can be computed, we think it necessary to remand to the Board for a hearing to determine when Chafin would have been recalled to work in her normal rotation time following her leave of absence. She was not entitled to return to work immediately upon returning to the Company's plant. Since her leave was indefinite she was only entitled to come back to work when her former or a similar position became available in the usual course of operation.

### D. The Discharge of Leona B. Altenbaumer.

Leona Altenbaumer, a known member of the Union organizing committee and a union activist, was employed by the Company in 1963 and worked as a sewing machine operator until her termination on June 16, 1969. As a general rule, Altenbaumer made her work quota and was never reprimanded about her work during the five or so years of her employment.

When Altenbaumer was first employed, employees were permitted to take their production tickets, which are used by the Company to determine an employee's piece rate wages, to their homes overnight and paste them on cards and return them to the Company the following day. After a federal wage-hour investigation at the plant resulted in the ruling that the Company could no longer allow the employees to paste production tickets on their cards at home on their own time, Leiby announced to all employees that they were to paste their production tickets on their cards on Company time and turn them in on the day the production was performed.

During a routine check of production cards in mid-June, a production ticket which was over two months old was found on one of Altenbaumer's production cards. Upon being questioned by Leiby, Altenbaumer admitted she withheld the $1.10 ticket on a day she was above her quota and she turned it in on a day she failed to make her quota in order to keep herself out of "make up." Thereupon Leiby told Altenbaumer that it was "lying, cheating, and stealing" to hold back production tickets. Altenbaumer asked to be forgiven as she didn't know withholding production tickets constituted lying, cheating and stealing. She was terminated that day and not recalled.

The Company contends that Altenbaumer was fired because of this serious infraction of Company rules; that if many employees did withhold production tickets it would cause the Company's time study production records (and the costs computed thereon) to be inaccurate, which in turn would result in errors in the Company's pricing of its goods. The Company also mentions that an employee who makes a regular practice of withholding production tickets on good days and turning them in on days she fails to produce her quota could deceive the Company about her inability to make her production quota regularly.

■ The Board rejected this explanation as pretextual and found that Altenbaumer was discharged because of her union activities in violation of §§ 8(a) (3) and (1). While there is a serious question about the Board's finding as to Altenbaumer, there is substantial evidence to support the Board. Many employees held back production tickets when they exceeded their quota and the Company was aware of the practice, at least to a limited extent. Manager Leiby admitted at the hearing that in May 1969 employees Kay McElhannon and Polly Bryan told him that they held back production tickets but that no action was taken against them. This allegedly serious infraction was not listed among the Company's set of printed rules that was distributed to the employees and it is arguable that at least a preliminary warning should have been given by the Company. By this we do not hold that an employee can only be discharged for a violation of a printed rule. Whether the plausible reason given for termination was justified under the Act is of course a subjective determination based on all the circumstances. The Board's Order is entitled to enforcement on Altenbaumer.

E. The Discharges of Mary Lou and Ethel Mears.

Mary Lou Mears was a known member of the Union organizing committee and a union activist, frequently distributing union literature before work. In accordance with the Company's policy of laying off employees during slack times on a rotating basis, Mears was laid off from work about one day a week from the second week in May through the first two weeks in June. On June 16, Mears was told by floorgirl Delphia Murray that she would be off the next day. On June 17, instead of calling the Company herself, Mears telephoned employee Christine Walker, who had called the Company to check on work, and was told that the Company wanted her (Mears) to work the next day. Floorgirl Murray testified that she had told Mears on the 16th that she was to call

in on the 17th concerning when she should return to work. Mears reported for work on June 18 and worked the entire day. Leiby was informed by Murray that Mears had reported for work when she was not supposed to, but he permitted Mears to work the whole day. Late in the day Murray informed Mears that she would be off the following day, and, despite her subsequent efforts to return to work, she had not been recalled prior to these proceedings.

Ethel Mears, sister-in-law of Mary Lou Mears, was also discharged by the Company on June 18. Ethel Mears, who had worked in the finishing department since 1965, had signed a union card but was not a member of the Union organizing committee. Ethel Mears testified, and the Trial Examiner credited her account, that floorgirl Murray told her on June 16 that she would be off the 17th but that she should come in the following day, June 18. Mears came in on the 18th and was promptly informed that there was no work for her that day. Within a half hour of her arrival Mears clocked out and departed. She had not been recalled prior to these proceedings.

The Company claims that both Ethel and Mary Lou Mears committed serious violations of the Company's rotating lay-off system by reporting for work when not scheduled. When a non-scheduled employee works, the piece work of the scheduled employees must be reduced in order to supply work to the non-scheduled employee. Consequently, there is not enough work to go around and there is a likelihood that the scheduled employees will fail to make production, yet the Company will still have to pay the minimum hourly makeup wage of $1.60.

■ There is substantial evidence to support the Board's finding that both Mary Lou and Ethel Mears were discharged for discriminatory reasons. Although the Company charges that reporting for work on a day in which one is not scheduled to work constitutes insubordination, it is apparent that the Company made no effort here to deter-

mine whether the "mistake" made by both employees was an innocent one. Furthermore, the credited evidence shows that Ethel Mears was told to report for work on June 18. Neither Ethel Mears nor Mary Lou Mears was told on June 18 that she was being terminated because she had appeared at work without permission. Ethel was told to go home because there was no work for her that day, and Mary Lou was told by floorgirl Murray after working the entire day that she would be off the following day. This failure of the Company to formally discharge the two Mears on the 18th coupled with the fact that the Company had never posted a notice about checking with the plant before coming in for work makes the Company's defense that they had committed a serious infraction of the rules appear to be a post hoc rationalization.

The Board's Order is enforced except as to the Nina Jean Greene Complaint, which is denied enforcement. Additionally, for the purpose of computing the loss of pay suffered by Patricia Chafin, Mary Lou Mears and Ethel Mears, we remand to the Board for a hearing to determine when each would have been recalled to work in the usual rotation time following her particular leave of absence or lay-off.