NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

John WARNER, d/b/a D. J. W. Cartage, Respondent.

No. 78–1089.

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 13, 1978.

Decided Nov. 20, 1978.

---

Jesse I. Etelson, Atty., N. L. R. B., Washington, D. C. (argued), John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, and Marjorie S. Gofreed, Atty., Washington, D. C., on brief, for petitioner.

Ralph E. Kennedy, St. Louis, Mo., argued and on brief, for respondent.

Before VAN OOSTERHOUT, Senior Circuit Judge, and LAY and BRIGHT, Circuit Judges.

VAN OOSTERHOUT, Senior Circuit Judge.

This case is before the Court upon the application of the National Labor Relations Board for enforcement of its orders[1] against John Warner, doing business as D. J. W. Cartage ("the Company"). The Court has jurisdiction of the proceedings, the alleged unfair labor practices having occurred in Minneapolis, Minnesota, where the Company is engaged in a local cartage business. The Company utilizes the services of five truck drivers, four of whom are acknowledged to be employees. The status of the fifth driver, Wesley Warner, is in dispute.

On March 15, 1976, two of the Company's drivers began picketing the Company's premises with signs stating that the Union[2] was striking for recognition. That day, and the day thereafter, Wesley Warner refused to cross the picket line to go to work. When the picketing ceased on March 16, the Company permitted the two strikers to return to work but refused to reinstate Wesley. On March 25, the Company sent Wesley a letter notifying him that his contract with the Company was terminated for his failure to perform his duties on March 15 and 16.

---

1. The Board's orders are reported at 227 NLRB 1757 and 231 NLRB No. 188.

2. Local No. 544, Over-the-Road, City Transfer, Cold Storage, Grocery and Market Drivers and Helpers, Inside Employees, affiliated with International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America.

In the meantime, on March 15, the Company had filed a petition for an expedited election with the Board. In the election held March 19, two drivers voted for the Union and two voted against it. The Company challenged the ballot of Wesley Warner, claiming that he should not be allowed to vote because (1) he was an independent contractor and not an employee, and (2) he enjoyed a "special status" with the Company by virtue of the fact that he was the brother of the Company's owner, John Warner.

After a hearing before an Administrative Law Judge who determined that Wesley Warner was an employee and that his vote should be counted, the Regional Director opened the challenged ballot which was cast in favor of the Union. On February 8, 1977, the Union was certified as the collective bargaining representative of the Company's drivers. Thereafter, the Company refused to bargain with the Union. In the ensuing unfair labor practice proceedings, the Company repeated the contentions it had made in the representation proceedings and in addition argued that Wesley Warner's ballot should not have been counted because his relationship with the Company was terminated before his ballot was counted.

In the representation proceedings, the Board determined that Wesley Warner was an employee within the meaning of the Act. The Board also found that the Company discharged Wesley for honoring a lawful recognitional picket line in violation of Sections 8(a)(1) and (3). In the unfair labor practice proceeding, the Board found that the Company's admitted refusal to bargain with the Union violated Sections 8(a)(1) and (5).

The Company attacks the decisions of the Board on three related grounds. First, the Company contends that Wesley Warner was an independent contractor and therefore ineligible to vote in the representation election. Second, the Company argues that even if Wesley is an employee, he should not have been included in the bargaining unit because he enjoyed a special status with the Company by virtue of the fact that he is the brother of the Company's owner, John Warner. Third, the Company contends that Wesley's vote should not have been counted because Wesley had voluntarily relinquished any possible rights to reinstatement and backpay prior to the time his challenged ballot was counted.[3]

I. Employee or Independent Contractor.

The Act does not define the term "employee" in detail. However, Section 2(3) provides that any "individual having the status of an independent contractor" shall not be considered an employee entitled to the protections of the Act. The Supreme Court has made it clear that the distinction between employees and independent contractors must be made by the application of general agency principles on a case-by-case basis. *NLRB v. United Insurance Co.*, 390 U.S. 254, 256, 88 S.Ct. 988, 19 L.Ed.2d 1083 (1968). Traditionally, this inquiry has focused upon "the nature and amount of control reserved by the person for whom the work is done." *Minnesota Milk Co. v. NLRB*, 314 F.2d 761, 765 (8th Cir. 1965), quoting *NLRB v. Phoenix Mut. Life Ins. Co.*, 167 F.2d 983, 986 (7th Cir. 1948). It is the *right* to control which is the determining element. *NLRB v. Phoenix Mut. Life Ins. Co., supra*, 167 F.2d at 986; *Azad v. United States*, 388 F.2d 74, 76 (8th Cir. 1968); *NLRB v. Cement Transport Inc.*, 490 F.2d 1024, 1027 (6th Cir. 1974). All of the incidents of the individual's relationship must be assessed and weighed with no one factor being decisive. These factors include the right to hire and discharge persons doing the work, the method and determination of the amount of the payment to the workmen, whether the person doing the work is engaged in an independent business or enterprise, whether he stands to make a profit on the work of those

---

**3.** The Company does not otherwise challenge the sufficiency of the evidence establishing the violations of §§ 8(a)(1), (3) and (5).

under him, the question of which party furnishes the tools or materials with which the work is done, and who has control of the premises where the work is done. In addition . . . consideration must be given to other factors, such as whether the relationship is of a permanent character, the skill required in the particular occupation, and who designates where the work is to be performed.

*Minnesota Milk Co. v. NLRB, supra,* 314 F.2d at 765.

Since agency principles are to be applied, we must examine the nature of the Company's operations and Wesley Warner's working relationship with the Company. The Company has engaged in the cartage business for over a decade. Its principal revenues derive from a contract entered into with Airborne Freight Corporation, a domestic and international freight forwarder. Under this contract the Company is obligated to act as an independent cartage agent providing pickup, transportation and delivery service of air freight in the Minneapolis area. The contract states that the Company has sole discretion and control over the manner and means of its performance, including but not limited to the selection and supervision of the Company's employees. The Company hired five drivers to haul the air freight. Four of these drivers operated Company-owned trucks, while the fifth, Wesley Warner, operated his own truck.

The record reveals that all five drivers worked substantially the same hours and performed precisely the same work. At approximately 7:30 each morning, the drivers were required to report to John Warner who would distribute the bills of lading for the freight to be delivered. Each driver was assigned a specific geographic area in which he was to make deliveries and pickups. These areas were "exclusive" to each driver, but occasionally John Warner would direct a driver to make a pickup or delivery in an area assigned to another driver if the latter were unable to complete his work. After the drivers delivered the freight assigned to them in the morning, they were required to report back to John Warner at

noon to receive bills of lading for freight that had arrived while they were on the road. Although the Company did not require the drivers to make their deliveries in a specific order, the drivers were not free to decide to deliver freight on a day other than the one on which it was assigned to them. The drivers were also required to notify John Warner if they were to be absent or late in reporting at any time. In the event that a driver went on vacation or otherwise could not report for work, John Warner would fill in and make deliveries in that driver's area. None of the drivers were permitted to hire replacement drivers.

Due to the routine nature of the work performed by the drivers, little supervision of their activities was necessary. However, John Warner monitored and regulated the conduct of the drivers toward customers, their use of their two-way radios, and their daily routine and delivery deadlines. When the Company received complaints concerning the drivers' actions, John Warner would "talk" to the offending drivers to ensure that the conduct giving rise to the complaints was not repeated.

The drivers were paid according to the number of bills of lading they handled and returned to the Company. No deductions for taxes, social security, insurance or pension programs were made from the drivers' paychecks. Nor did any driver receive paid vacations or extra money for working holidays.

In all of the above respects, the working relationship of Wesley Warner with the Company was virtually identical to that of the other drivers. In some respects, however, Wesley's position was unique. Wesley began hauling freight for the Company in 1966, a time when all the Company's drivers operated their own trucks. By the time of Wesley's discharge in 1976, none of the other drivers had worked for the Company for more than three years and all but Wesley operated Company-owned trucks. Unlike these other drivers, Wesley worked under three written contracts executed in 1969 and 1970. All three contracts contained substantially the same provisions. They re-

cited that Wesley was to be an "independent contractor" and provided that he was to furnish, at his own expense, his own vehicle, insurance covering that vehicle, and all licenses and permits required by law for the operation of his vehicle. Pursuant thereto, Wesley used his own truck to haul freight for the Company and paid all the expenses related to its operation, including repairs, gas, oil and insurance. He also obtained a "local cartage carrier" license from the State of Minnesota which was required of any driver hauling freight with his own vehicle. Since Wesley owned and operated his own truck, he was paid $1.75 per bill of lading while the other drivers who operated Company-owned trucks were paid $1.35 per bill of lading.[4] Wesley computed his earnings at the higher rate and submitted a bill to the Company along with his bills of lading every week. The other drivers turned their bills in on a daily basis for the Company to compute their earnings.

The Board examined all these facts and determined that Wesley Warner was an employee of the Company within the meaning of the Act. Although this determination involved "no special expertise that a court does not possess," *NLRB v. United Insurance Co., supra,* 390 U.S. at 260, 88 S.Ct. at 991, our review is limited. If substantial evidence supports the Board's conclusion, this Court is bound by that conclusion even though the Board chose between "two fairly conflicting views" of the employee-independent contractor distinction. As the Company asserts, the record contains some factors indicative of independent contractor status. Included among these are Wesley's operation of his own truck, his payment of all expenses related to its operation, and his status as holder of a state license to operate a local cartage business. However, a review of the entire record as a while leads us to conclude that substantial evidence supports the Board's finding that Wesley Warner was an employee and not an independent contractor.

Numerous aspects of Wesley Warner's relationship with the Company indicate his status as an employee. Most of the terms and conditions of his employment were virtually identical to those of the other drivers who are conceded to be employees. Significantly, Wesley was subject to the same degree of supervision and control exercised over the other drivers. It would be unreasonable to suggest that the Company had to exercise a greater degree of supervision over Wesley for him to be considered an employee. *Cf. Joint Council of Teamsters No. 42 v. NLRB,* 146 U.S.App.D.C. 275, 280, 450 F.2d 1322, 1327 (1971). Furthermore, Wesley's work was essential to the Company's normal business and did not require a high degree of skill. He was prevented from hiring replacement drivers. The Company told him where to make deliveries within an assigned area in which he had no proprietary rights. The Company could split up his area or take it away from him at any time for any reason. *Cf. Seven-Up Bottling Co., of Boston, Inc. v. NLRB,* 506 F.2d 596, 599 (1st Cir. 1974). In addition, Wesley's income depended very little upon anything he did in the exercise of entrepreneurial skill. Wesley relied upon the Company to generate business within his assigned area. These factors amply support the Board's conclusion that Wesley Warner was an employee within the meaning of Section 2(3) of the Act.

II. Special Status.

The Company also contends that Wesley Warner, as the brother of the Company's owner, enjoys a special status which allies his interests with those of management. As evidence of this special status, the Company argues the same factors that it contended made Wesley an independent contractor. In addition, the Company points out that Wesley, unlike the other employees, received no weekly guarantee of $200, was not asked to work alternate Saturdays,

---

**4.** The drivers who operated Company-owned trucks were guaranteed a minimum of $200 a week. Wesley Warner had previously received a weekly guarantee, but it was discontinued

because, as John Warner testified, "He [Wesley] always made more than I could guarantee him."

worked under a written contract, and made a profit only after deducting his expenses from his gross revenues. The Company claims that the Board should not have included Wesley Warner in the bargaining unit of its employees due to these differences.

■ Under 29 U.S.C. § 159(b)[5] the Board is invested with a broad discretion in determining bargaining units "to assure to employees the fullest freedom" in exercising their rights under the Act. Once made, the decision of the Board is entitled to great weight on review. *Packard Motor Car Co. v. NLRB,* 330 U.S. 485, 67 S.Ct. 789, 91 L.Ed. 1041 (1947).

■ In determining whether an employee is properly included in an appropriate bargaining unit, a key consideration is whether that employee has a sufficient community of interest with other members of the unit. *NLRB v. Hoerner-Waldorf Corp.,* 525 F.2d 805 (8th Cir. 1975). Difficulties arise in making this determination when the individual stands in a close family relationship with his or her employer. In certain circumstances, the familial bond between an employer and employee may be so close as to separate the related employee from the "community of interests" shared by the other employees. In such situations, the inclusion of the related employee in a bargaining unit with other employees may hinder the employees in organizing themselves and bargaining collectively as effectively as if a representative of management were included in the bargaining unit. However, since 1954 the Board has held that

The mere coincidence of a family relationship between an employee and his employer does not negate the mutuality of employment interest which an individual shares with his fellow employees, absent evidence that because of such relationship he enjoys a special status which allies his interests with management.

*International Metal Products Co.,* 107 NLRB 65, 67 (1953); *Pargas of Crescent City, Inc.,* 194 NLRB 616 (1971); *NLRB v. Caravelle Wood Products Co.,* 466 F.2d 675 (7th Cir. 1972); *NLRB v. Jackson Farmers, Inc.,* 432 F.2d 1042 (10th Cir. 1970); *Cherrin Corp. v. NLRB,* 349 F.2d 1001 (6th Cir. 1965). The Board has also employed the "community of interests" standard in this regard. *Cerni Motor Sales, Inc.,* 201 NLRB 918 (1973); *NLRB v. Caravelle Wood Products,* 504 F.2d 1181 (7th Cir. 1974). *See also,* 26 A.L.R.Fed. 421.

■ The Board affirmed the findings of the Administrative Law Judge that Wesley Warner enjoyed no special status which would warrant his exclusion from the bargaining unit. We hold that the Board acted well within its broad discretion when it included Wesley Warner in the bargaining unit of the Company's employees.

III. Waiver of Right to Reinstatement and Backpay.

■ Approximately two months after the representation election was held, Wesley Warner entered into an agreement with the Company whereby he waived any right to reinstatement and back pay arising from his discharge by the Company. The Regional Director did not count Wesley's challenged ballot until after a hearing eight months later. The Company contends that Wesley's vote should not have been counted because Wesley was no longer sufficiently concerned with the terms and conditions of employment in the unit to warrant his participation in the representation election. However, the facts upon which the contention is based were known and available to the Company prior to the hearing before the Administrative Law Judge in the representation proceeding. The Company failed to raise the contention until the unfair labor practice proceeding, even though, as the Board found, the Company was given a full opportunity to do so in the representation

5. This section reads as follows:

The Board shall decide in each case whether, in order to assure to employees the fullest freedom in exercising their rights guaranteed by this subchapter, the unit appropriate for the purposes of collective bargaining shall be the employer unit, craft unit, plant unit, or subdivision thereof: . . .

proceeding. As such, the contention was untimely raised. *See Pittsburgh Plate Glass Co. v. NLRB*, 313 U.S. 146, 161–62, 61 S.Ct. 908, 85 L.Ed. 1251 (1941); *NLRB v. Griffith Oldsmobile, Inc.*, 455 F.2d 867, 868 (8th Cir. 1972). In the absence of newly discovered or previously unavailable evidence, the Company was not entitled to relitigate the status of Wesley Warner. *NLRB v. Union Brothers, Inc.*, 403 F.2d 883, 887 (4th Cir. 1968). Therefore the question is not properly presented to us for review.[6]

Enforcement of the Board's orders granted.

---

**6.** Even if the Company's contention were timely, it is without merit. When the Company refused to reinstate Wesley Warner after the strike, Wesley became a discriminatee who retained his employee status. Therefore, he was entitled to participate in the representation election under the Board's voter eligibility rules. *See Macy's Missouri-Kansas Division v. NLRB*, 389 F.2d 835, 842 (8th Cir. 1968).