**SEVEN-UP BOTTLING COMPANY, OF BOSTON, INC., Petitioner,**

**v.**

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 74-1200.**

United States Court of Appeals, First Circuit.

Argued Oct. 8, 1974.

Decided Nov. 29, 1974.

---

George H. Foley, Boston, Mass., with whom Hale & Dorr, Boston, Mass., was on brief, for petitioner.

William H. DuRoss, III, Atty., Washington, D. C., with whom Peter G. Nash, Gen. Counsel, Irving M. Herman, Deputy Gen. Counsel, Patrick Hardin, Associate Gen. Counsel, and Elliott Moore, Deputy Associate Gen. Counsel, Washington, D. C., were on brief, for respondent.

Before ALDRICH, McENTEE and CAMPBELL, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

The Seven-Up Bottling Company of Boston petitions this court to review an order of the National Labor Relations Board, and the Board cross applies for enforcement of its order directing the company to cease certain unfair labor practices and to bargain with the New England Joint Board, Retail, Wholesale & Department Store Union, AFL–CIO. The union had filed a representation petition with the Board on October 15, 1973, requesting certification as the bargaining representative of a unit consisting of the company's distributors. After a hearing the Board's regional director rejected the company's contention that the distributors were "independent contractors" rather than "employees" under section 2(3) of the National Labor Relations Act, 29 U.S.C. § 152(3), and directed an election for a unit including the distributors and driver-salesmen. The company's request for review was denied by the Board, and the union won the Board-ordered election by a vote of 27 to 3. Pursuing the accepted method for challenging before this court the Board's determination that the distributors are employees, the company refused to bargain with the union. In the ensuing unfair labor practice proceeding, the Board found the company in violation of sections 8(a)(1) and (5) of the Act.

It is settled that the Board and courts are to apply general principles of agency law in distinguishing employees from independent contractors. NLRB v. United Ins. Co., 390 U.S. 254, 256, 88 S. Ct. 988, 19 L.Ed.2d 1083 (1968). In 1947 Congress passed an amendment to the Act specifically excluding independent contractors from the definition of "employee" so that determinations on this question would be based on ordinary tests of the common law rather than on the Board's view of policy considerations embodied in the Act. H.R.Rep. No. 245, 80th Cong., 1st Sess., 18 (1947); H.R. Conf.Rep. No. 510, 80th Cong., 1st Sess., 32–33 (1947); 93 Cong.Rec. 6441–42 (June 5, 1947). At common law courts often have had difficulty deciding whether an individual is an employee or independent contractor in cases where a principal would be liable for acts of negligence in the performance of duties only if the acts were committed by an agent who is a servant. The right to

control the manner of physical performance of the services—as opposed to control over the results sought—is generally determinative of employee status, although a number of matters of fact must be considered in making that determination. *See* Restatement of Agency (Second) § 220(1) & (2) (1957), and official comments thereon. In cases of employment of a driver with vehicles, the existence of the right to control has traditionally been the decisive question. *See generally* W. Seavey, Agency § 84, at 142–43 (1964), and cases cited therein. The Board has consistently applied a similar agency test.[1] *See, e. g.,* News Syndicate Co., 164 N.L.R.B. 422 (1967); Pure Seal Dairy Co., 135 N.L.R.B. 76, 79 (1962); Squirt-Nesbitt Bottling Corp., 130 N.L.R.B. 24 (1961).

In order to determine whether the Board has correctly applied the test here, we shall first consider the facts in the record bearing upon the relationship between the distributors and the company. The company had franchises to produce and sell several varieties of fountain syrup and beverages within an area covering eastern Massachusetts. Prior to 1970 all deliveries of products to retail accounts were made by driver-salesmen on the company payroll and in company trucks. In May, 1970, the company offered these employees an opportunity to become distributors under an oral arrangement which could be terminated at will by the company or distributor. Under the arrangement a distributor is assigned an exclusive territory, or route, by the company. The company may alter, and has altered, the size of a route. A distributor may lose an account on his route if the customer will not buy from him.

The distributors are charged for products loaded on their trucks at the company's plant, and their profits derive from the difference between the price received from customers and the price paid to the company and other expenses. The company pays no salary, unemployment insurance, Social Security, or Workmen's Compensation insurance, and takes no tax deductions, on behalf of the distributors. The annual earnings of distributors range from $27,000 to $13,000, while driver-salesmen employed by the company and trained to become distributors receive about $7000 in wages and $2000 in benefits annually. On cash accounts the distributors are responsible for their own collections; but when the customer is a large independent or chain store with a central billing office, the company bills the customer directly through a charge account and assumes credit risks, and the distributor receives a credit towards his purchases. The company maintains a list of suggested prices to charge retailers, but the distributors need not follow the list price although in practice they almost always do. The company states the wholesale price and a suggested retail price on its standard sales receipts which are given by distributors to customers.

At the time of the regional director's decision, twenty-one of the distributors had purchased their trucks directly or indirectly from the company, and the other three used trucks leased from the company. About half the purchases were financed through a bank of which the company president is an officer. The bank has an agreement from the company to buy the truck of any distributor who defaults on payments. The distributors pay all expenses for operation, maintenance, and garaging of their trucks, which are registered and insured in the distributors' names. The company at its own expense paints the trucks in the same color and style, and the trucks bear emblems of Seven-Up or of

---

1. "Where the one for whom the services are performed retains the right to control the manner and means by which the result is to be accomplished the relationship is one of employment, while, on the other hand, where control is reserved only as to the result sought, the result is that of an independent contractor. The resolution of this question depends on the facts of each case, and no one factor is determinative."
News Syndicate Co., 164 N.L.R.B. 422, 423 (1967).

the company's other brands of beverage. The distributors hire and pay for helpers when necessary, but in practice the distributors use only one truck. The distributors may not sell products in competition with those of the company. The company, in cooperation with the franchising parents, pays for advertising carried on the trucks and for other promotional material. The company does not require the wearing of uniforms, but suggests it. The distributors do buy and usually wear uniforms, which include an insignia provided by the company.

Three company sales counsellors assist the distributors in promotions and displays, and company merchandisers visit customers' stores and occasionally accompany the distributors in their trucks. New driver-salesmen and newly hired distributors who were not driver-salesmen previously are introduced to customers on their routes by the counsellors and merchandisers, who also show the new drivers how to put out racks, stock shelves, and call on special accounts. The company sets sales quotas for each distributor according to target goals of the parent franchisors. Distributors exceeding their quotas often receive prizes or cash incentives in addition to the increased sales and profits. The company invites distributors to attend periodic company sales meetings, which provide information on improving sales and on incentive programs. One distributor, who had the lowest sales results, was suspended by the company's director of marketing when he refused to attend the sales meetings. Occasionally the company conducts customer surveys to evaluate the distributors' performance. There was testimony that company officials had warned one distributor about his attire and had commented to another distributor on the condition of his shelves and displays. The company has a "100 Point Club" for distributors, who can earn points and then prizes for obtaining prime display space in stores, and who can lose points for irregular personal appearance or for an untidy truck.

The company provides distributors with a direction book which lists the names and locations of accounts on the route, the products and quantity to be carried, the person to see in a store, and directions to the next stop. In some instances scheduled stops are listed by day and time when demanded by a customer, but distributors are generally free to follow their own schedule and to make deliveries when they wish. A schedule for loading at the company plant was established to avoid waiting time.

Applying the right-to-control test after a hearing, the regional director found that the distributors are employees rather than independent contractors. The regional director acknowledged that a number of the facts might be indicative of independent contractor status. These included the distributors' ownership and maintenance of their own trucks, their hiring of helpers, their extension and assumption of the risks of customer credit, and their absence from the company payroll. However, the regional director stated that these facts alone do not establish independent contractor status and were outweighed by other facts demonstrating the company's effective control over the distributors' operations. Among these facts were the company's control of the size of each distributor's territory; its assistance in obtaining new accounts and its extension of credit to chain stores and supermarkets; its assistance in customer relations and merchandising; and its incentive program for performance, including the appearance of uniforms and trucks. In addition, the regional board cited the fact that the company can terminate at will the verbal agreement with the distributors, who neither pay for nor have a proprietary interest in their routes. The Board, denying the company's motion to reopen the representation hearing, accepted the regional director's finding that the distributors are employees under the Act.

■ Since the Board's conclusion was an application of law to facts and involved no special agency expertise, the company contends that the standard of review by this court is not whether substantial evidence supports the Board's ultimate finding but rather whether the Board had "a choice between two fairly conflicting views." United Insurance, *supra*, 390 U.S. at 260, 88 S.Ct. at 991, *quoting* Universal Camera Corp. v. NLRB, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951). We do not read "fairly conflicting views" to mean complete equipoise. Nor do we think the Court in *United Insurance* intended to establish a different standard from that of "substantial evidence" as articulated in *Universal Camera*. And under either formulation the mere fact that the reviewing court itself would have taken a different original view of the matter is insufficient for reversal. The Board decision should be set aside only if not supported by substantial evidence when viewed in light of the entire record, including the evidence opposed to the Board's position. The record amply supports the Board's conclusion that the company has the right to, and does, control the distributors' performance of their duties—not by any formal authority, but by means of suggestions which are adhered to because of the company's power to grant and revoke distributorships and to alter their value at will. *Cf.* The Herald Co. v. NLRB, 444 F.2d 430 (2d Cir. 1971). It is significant that none of the distributors—whatever their theoretical freedom to deliver noncompeting products—perform delivery services for anyone but the company. "[D]aily employment in the regular business of the employer" is a factor which has led state courts to find the driver to be a servant—especially if he is employed at will. *See* W. Seavey, Agency § 84, at 143 & nn. 41–42 (1964), and cases cited therein. It is also significant that the distributors are trained by the company's supervisory personnel and perform functions that are essential to the company's normal operations. Moreover, the distributors do business in the company name with company assistance and guidance. *Cf.* United Insurance, *supra*, 390 U.S. at 259, 88 S.Ct. 19.

The company further argues that the Board order should not be enforced because the Board's determination of employee status is inconsistent with its prior holdings in Pure Seal Dairy Co., 135 N.L.R.B. 76, 79 (1962), and American Factors Co., 93 N.L.R.B. 447, 448–49 (1952). But while these cases have undeniable similarities, they are distinguishable on their facts. We disagree with the company's contention that they stand for an approach irreconcilable with the result reached here. The Board in other not dissimilar cases has found drivers to be employees. *See e. g.,* NLRB v. Pepsi Cola Bottling Co. of Mansfield, 455 F.2d 1134 (6th Cir. 1972); Frito-Lay, Inc., 178 N.L.R.B. 611 (1969); Pepsi Cola Bottling Co. of Michigan, 156 N.L.R.B. 80 (1965); Squirt-Nesbitt Bottling Corp., 130 N.L.R.B. 24 (1961). No easy formula or isolated factor is determinative. All the incidents of the relationship must be assessed and weighed in each case. *United Insurance, supra*, 390 U.S. at 258, 88 S.Ct. 19.

■ We hold that the Board did not err in finding the company's distributors to be employees under section 2(3) of the Act.

Enforcement granted.