**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**AMBER DELIVERY SERVICE, INC., Respondent.**

**No. 80–1623.**

United States Court of Appeals, First Circuit.

Argued March 3, 1981.
Decided June 11, 1981.

W. Christian Schumann, Washington, D.C., with whom William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associ-

ate Gen. Counsel, and Sandra Shands Elligers, Washington, D.C., were on brief, for petitioner.

Lawrence M. Siskind, Brockton, Mass., with whom Robert H. Greene, Brockton, Mass., was on brief, for respondent.

Before BOWNES and BREYER, Circuit Judges, and WYZANSKI, Senior District Judge.*

BREYER, Circuit Judge.

In a decision and order dated June 24, 1980, the National Labor Relations Board ruled that respondent Amber Delivery Service, Inc. (Amber) had committed several unfair labor practices in violation of section 8(a)(1) and (3) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), (3) (1970). Specifically, the Board found that Amber had (1) impermissibly interrogated and solicited help from employees in an effort to forestall union organizing activities; (2) imposed one-day suspensions on three employees in retaliation for their union activities; and (3) instituted changes in working conditions in an unlawful attempt to convert its employees to independent contractors and thereby deprive them of their statutory right to union representation. Underlying these findings was the Board's preliminary determination that Amber's "employees" in fact enjoyed such status—rather than that of "independent contractors"—and thus were entitled to the Act's protection. Upon concluding that the unfair practices were indicative of a pervasive and ongoing anti-union animus on the part of Amber, the Board ruled that a fair election was unlikely and that a bargaining order was necessary. It now petitions for enforcement of its order. We affirm the Board's findings of various unfair labor practices but vacate the bargaining order, finding Amber's actions insufficiently coercive to warrant this extraordinary mandate.

* Of the District of Massachusetts, sitting by designation.

## I.

### Background

Amber operates a package-delivery service, concentrated in the Boston area, which specializes in same-day pickup and delivery. During the relevant period, it employed sixteen to eighteen drivers, of whom approximately half worked as "call" drivers and half as "distribution" drivers. The call drivers were essentially free-floating; they picked up packages at designated locations and delivered them to others in accordance with customer orders typically received over a two-way radio from the company dispatcher. The distribution drivers, by contrast, each serviced a specific geographic area, making a daily delivery to customers within that area of packages that had earlier been deposited at Amber's terminal. Both groups of drivers were paid a commission equal to one-third of their daily gross revenues.

In the fall of 1976, Amber decided to convert all of its drivers to owner-operator status, reasoning that such a change would boost productivity and increase profits for company and driver alike. Three steps were required of each driver: (1) purchase of his own vehicle; (2) acquisition of contract carrier authority from the Massachusetts Department of Public Utilities; and (3) execution of a contract carrier agreement with the company. Commissions were increased to fifty percent for call drivers and up to sixty-five percent for distribution drivers depending upon the area served. Amber's president initially designated March 31, 1977 as the deadline for conversion, warning that all who failed to comply would be discharged. By that date, all but five or six drivers were fully converted. Because these remaining drivers claimed to be temporarily unable, rather than entirely unwilling, to undertake the conversion, the deadline was extended. However, on June 15, 1977, the four remaining holdouts were discharged[1] and the

1. An unfair labor practice charge contesting these dismissals was filed on June 16, 1977 but dismissed one month later by the regional director, who concluded that the discharges were

conversion to owner-operator status was complete.

In mid-April of that year, two drivers—apparently disgruntled with this change in status and with a recently implemented twenty percent reduction in rates (and thus commissions)—contacted a representative of the local teamsters union.[2] Each of them signed a union authorization card designating the union as his "sole and exclusive representative for the purposes of collective bargaining" with Amber, and they each solicited and obtained, over the next several weeks, signed authorization cards from other drivers. On May 11, the union filed a petition with the Board's regional office requesting an election in an employee unit consisting of Amber's drivers and warehousemen. A representation hearing was held several weeks later devoted primarily to whether the drivers—in their new role as owner-operators—constituted employees or independent contractors. This determination was necessitated by section 2(3) of the Act, which specifically excludes from the definition of "employee"—and thus from statutory coverage—any "individual having the status of an independent contractor." 29 U.S.C. § 152(3) (1970). While the regional director's decision was pending, the union on June 20 called a strike at Amber's facility to protest the dismissal of the four drivers who had not converted to owner-operator status. On July 29, the regional director issued his decision, finding that the drivers were employees and directing that an election be held in a unit consisting of "all distributor and call deliverymen."[3]

Thereafter, in a rather confusing maneuver described in greater detail below, Amber on August 9 moved for reconsideration by the regional director, representing that various "modifications" had been made in the drivers' working conditions, which were

"in accordance with economically motivated plans."

**2.** Teamsters Local 25, a/w International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America.

sufficient to convert the drivers to independent contractors. On August 26, the regional director vacated his Decision and Direction of Election and reopened the hearing to receive additional evidence "with respect to purported changes made by the Employer in its relationship with its owner-operators." A hearing was conducted on September 1 and 30. On October 12, the union filed the unfair labor practice charges at issue here, challenging the propriety of these "modifications" as well as other actions earlier undertaken by Amber. The regional director has held the representation proceeding in abeyance pending resolution of these charges.

## II.

### The Drivers' Status Before August 9

We must first decide whether the Board correctly held that, prior to August 9, Amber's drivers were employees and not independent contractors. It is well-established that general principles of agency law govern the distinction between employee and independent contractor for purposes of the Act. *E. g., NLRB v. United Ins. Co.,* 390 U.S. 254, 256, 88 S.Ct. 988, 989, 19 L.Ed.2d 1083 (1968); *Seven-Up Bottling Co. v. NLRB,* 506 F.2d 596, 597 (1st Cir. 1974). The House Report on the legislation specifically excluding "independent contractor" from the definition of "employee" outlined this distinction as follows:

"Employees" work for wages or salary under direct supervision. "Independent contractors" undertake to do a job for a price, decide how the work will be done, usually hire others to do the work, and depend for their income not upon wages, but upon the difference between what they pay for goods, materials, and labor and what they receive for the end result, that is, upon profits.

**3.** More specifically, the unit included "[a]ll distributor and call deliverymen of the Employer at its Malden, Massachusetts facility, excluding part-time warehousemen, office clerical employees, professional employees, guards and supervisors as defined in the Act."

H.R.Rep.No.245, 80th Cong., 1st Sess. 18 (1947), *reprinted in* 1 Legislative History of the Labor Management Relations Act, 1947, at 309 (1948). Thus the Board, in applying the common law test of independence, has looked to the right of control: whether the putative employer has the right to control not only the results sought but also the means by which those results are achieved. *E. g., Merchants Home Delivery Service, Inc. v. NLRB*, 580 F.2d 966, 973 (9th Cir. 1978); *Seven-Up Bottling Co. v. NLRB*, 506 F.2d at 597–98; *News Syndicate Co.*, 164 N.L.R.B. 422, 423 (1967). It has also looked to the risk of loss and opportunity for profit and to the degree of "proprietary" interest in, for example, a route or a dealership. *E. g., Brown v. NLRB*, 462 F.2d 699, 705 (9th Cir.), *cert. denied*, 409 U.S. 1008, 93 S.Ct. 441, 34 L.Ed.2d 301 (1972); *El Mundo, Inc.*, 167 N.L.R.B. 760, 761 (1967); R. Gorman, Basic Text on Labor Law 30 (1976). The determination of "independence", however, ultimately depends upon an assessment of "all of the incidents of the relationship . . . with no one factor being decisive." *NLRB v. United Ins. Co.*, 390 U.S. at 258, 88 S.Ct. at 991; *see* Restatement (Second) of Agency § 220 (1957). Our task on review is to ascertain whether the Board's evaluation of such factors is "supported by substantial evidence when viewed in light of the entire record, including the evidence opposed to the Board's position." *Seven-Up Bottling Co. v. NLRB*, 506 F.2d at 600. So long as the Board's position represents a "choice between two fairly conflicting views," it should be enforced even if this court "would justifiably have made a different choice had the matter been before it *de novo." Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951), *quoted in NLRB v. United Ins. Co.*, 390 U.S. at 260, 88 S.Ct. at 991.

We shall first examine the status of the owner-operators immediately prior to the August 9 changes in their working conditions. As in all but the rarest of cases, there are pertinent factors that cut in both directions. The drivers' ownership of their respective vehicles and the financial obligations attending such arrangement are of course suggestive of independent contractor status; they show that the drivers have invested capital as well as labor in their enterprise, and that they have more than their labor skills alone to sell to others who might hire them. Each owner-operator purchased his vehicle without assistance from Amber. All expenses connected with its operation—including fuel, repairs, taxes and insurance—are borne by the driver. All risks associated with the truck also fall on the owner's shoulders; by contract, he must indemnify Amber for any personal injury claims stemming from the operation of his vehicle, and he is responsible for any damage to freight in his possession. The absence of any guarantee of a minimum daily income or volume of deliveries poses an additional risk to each owner. Compensation is on a commission rather than hourly basis, and the company makes no deductions for unemployment, workmen's compensation, or social security insurance or for income taxes. The drivers receive no holiday or vacation pay. The fact of ownership and the attendant financial arrangements also afford each driver some opportunity for entrepreneurial enterprise, since each reduction in operating costs will provide a corresponding increase in his profit. Each driver in his discretion can decide not to work on any particular day—a freedom that further links his compensation to his personal initiative and effort. Additional indicia of independent contractor status derive from other facets of the drivers' working relationship with Amber. Each driver is free to hire assistants. Each can unilaterally and immediately terminate his contract carrier agreement with Amber by providing written or oral notice—as can the company. Finally, the respective carrier agreements signed by the drivers each explicitly state: "Nothing in this Agreement shall be in any way construed to constitute the [driver], or any of his agents, or employees, as an employee or representative of the Company."

Other factors, however, strongly militate in favor of an employer-employee relationship between Amber and its drivers.

Through a variety of rules, requests and retained powers, Amber exercises, or is capable of exercising, substantial control over the manner in which the drivers perform their deliveries. Each distribution driver services a specific geographic area assigned by the company and, while Amber is free to reassign service areas at any time, the driver is prohibited from expanding or restricting his territorial coverage without permission. Amber not only discusses with the driver any special demands of customers along his delivery route but also specifies the sequence in which deliveries are to be made.[4] Each distribution driver must load his vehicle at night or in the early morning, must report to work no later than 8:00 a. m. (or call in by that time if intending not to work), and is requested to phone the company every two hours during the day in case a pickup or delivery has been ordered in his area. The daily workload of each call driver, of course, is determined largely by the company dispatcher, who transmits customer orders by radio as they are received. Call drivers need not appear at the terminal in the morning but must report their location to the dispatcher by 8:00 a. m. Other requirements and requests evidencing Amber's control apply to both groups of drivers equally. All freight loads assigned by the company must be accepted and must be delivered promptly. Each driver, for the duration of his contractual relationship with Amber, is prohibited from using his vehicle to provide any type of related service elsewhere. The company provides training and orientation programs which the drivers are invited to attend and conducts safety meetings at which attendance is mandatory. Each driver must wear a uniform with the company insignia and must paint his vehicle in the company colors;[5] Amber bears half of the cost of uniforms and the entire cost of painting. A permanent or detachable sign bearing Amber's insignia must also be placed on each vehicle. The carrier agreement requires each driver to carry liability and cargo insurance for the company's protection. Finally, any driver is subject to termination for poor performance or as a result of external causes.

Apart from the question of Amber's supervisory powers with respect to the means of physical performance, there are several additional indicia of employee status. The drivers possess no proprietary interest in their respective delivery routes. All customers "belong" not to the drivers but to Amber. They negotiate their rates directly with, and make payments directly to, Amber; the drivers play no role in rate negotiations and handle no money except for an occasional C.O.D. delivery. In addition, the drivers not only receive frequent assistance with loading from Amber employees but occasionally assist other drivers with the loading work—receiving an hourly wage from the company for such effort. Finally, any driver whose contract with Amber is for any reason terminated is prohibited, for the next six months, from providing any type of delivery services to Amber's customers.

■ We believe that the Board could reasonably conclude that these various indicia of employee status outweigh those factors suggesting otherwise. Although the nature of the inquiry here—mandating an assessment of all facets of the working relationship—militates against ready comparisons of other cases, we note that a finding of employee status was upheld in closely related circumstances in *NLRB v. Warner*, 587 F.2d 896, 899–901 (8th Cir. 1978). Moreover, the instant situation would appear to

4. *See* note 5 *infra.*

5. It must be noted that, at the representation hearing, there was no evidence presented that the uniform and truck-painting rules were mandatory or that the company dictated the sequence of deliveries for all distribution drivers. Evidence of these requirements derives solely from Amber's subsequent admissions, contained in its motion for reconsideration and in its answer to the unfair labor practices complaint, that as of August 9 such practices were no longer observed. Absent these representations, these subsidiary findings of the ALJ would have been unsupported by substantial evidence. In light of Amber's admissions, we need not decide whether the absence of these elements would have been sufficient to convert the employees to independent contractors.

present a stronger case for such a finding than that involved in *Seven-Up Bottling Co. v. NLRB*, 506 F.2d 596 (1st Cir. 1974), in which we determined that the distributor-salesmen of the bottling company constituted employees. The circumstances there were closely analogous except that the distributors were generally free to follow their own schedule; received as compensation the difference between the price paid to the company and that charged to customers; were free to set customer prices (although they generally adhered to the company's suggested price list); were responsible for collecting payments from customers; and possessed (but had never exercised) the freedom to deliver noncompeting products. In contrast to *Seven-Up Bottling* and other salesmen-distributor cases in which the drivers are at liberty to set customer prices and pursue additional customer accounts, *see, e. g., Lorenz Schneider Co. v. NLRB*, 517 F.2d 445, 449–50 (2d Cir. 1975); *Frito-Lay, Inc. v. NLRB*, 385 F.2d 180, 185, 187 (7th Cir. 1967), the drivers here have scant opportunity for realizing additional profits through the exercise of entrepreneurial skill. By setting customer rates, and by regulating the volume of deliveries of each driver through the assignment of geographic areas and the use of a dispatcher, Amber effectively controls the two primary determinants of a driver's income. Moreover, each driver is prohibited from changing his assigned service area and from participating in a competing delivery service during the term of his contract. These constraints provide minimal play for entrepreneurial initiative and minimize the extent to which ownership of the truck gives its driver entrepreneurial independence.

A review of analogous cases also serves to underscore the extensive control exercised by Amber over the manner of physical performance. Six factors are particularly

noteworthy in this regard: the drivers must report in by 8:00 in the morning, *compare NLRB v. A. Duie Pyle, Inc.*, 606 F.2d 379, 382 (3d Cir. 1979); *Merchants Home Delivery Service, Inc. v. NLRB*, 580 F.2d at 974; they cannot refuse assigned loads, *compare NLRB v. A. Duie Pyle, Inc.*, 606 F.2d at 385; *Associated Gen. Contractors of Calif., Inc. v. NLRB*, 564 F.2d 271, 279 (9th Cir. 1977); Amber specifies the sequence of deliveries for all distribution drivers, *compare Merchants Home Delivery Service, Inc. v. NLRB*, 580 F.2d at 974; Amber can reassign or modify geographic areas for any reason, *see NLRB v. Warner*, 587 F.2d at 901; the drivers are prohibited from working for a competing delivery service, *compare NLRB v. A. Duie Pyle, Inc.*, 606 F.2d at 385; *Associated Gen. Contractors of Calif., Inc. v. NLRB*, 564 F.2d at 280; *SIDA of Hawaii, Inc. v. NLRB*, 512 F.2d 354, 357 (9th Cir. 1975); and Amber is free to terminate at will its agreement with any driver, *see Seven-Up Bottling Co. v. NLRB*, 506 F.2d at 599.[6] It is also significant that, before the conversion to owner-operator status had been completed, many of these requirements and other working conditions applied equally to the owner-operators and to those drivers who were concededly company employees. *See NLRB v. Warner*, 587 F.2d at 901. Moreover, in contrast to *Merchants Home Delivery Service, Inc. v. NLRB*, 580 F.2d at 974–75, each of the drivers here operates individually rather than as a corporation or partnership.

Finally, we note that the functions performed by the drivers demand little skill, *see* Restatement (Second) of Agency § 220(2)(d) (1957), and constitute a regular and essential part of the company's business operations. *See id.* § 220(2)(h); *Seven-Up Bottling Co. v. NLRB*, 506 F.2d at 600. In these circumstances,[7] whether or not we

---

**6.** Amber's contention that each of these constraints is necessary to ensure prompt and efficient delivery services is beside the point; the relevant inquiry here is not limited to those indicia of control that can be considered unessential.

**7.** That each driver expressly disclaimed the status of employee in his contract with Amber—although relevant as evidence of "an assumption of control by the one and submission to control by the other," Restatement (Second) of Agency § 220, comment m, at 492 (1957)—is by no means dispositive. *See, e. g., NLRB v. A.*

would have reached the same conclusion as an original matter,[8] we find that the Board's judgment represents at minimum "a choice between two fairly conflicting views." *NLRB v. United Ins. Co.*, 390 U.S. at 260, 88 S.Ct. at 991, *quoting Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951).

### III.

### *The Effect of the August 9 Changes*

We must next consider whether Amber's efforts to change the employees' status after August 9 succeeded in making them independent contractors and whether these efforts constituted an unfair labor practice. The Board found that Amber on August 9 instituted a series of changes in working conditions, having the general effect of increasing the drivers' discretion over their daily routines. Specifically, the drivers were (1) given the right to refuse loads and to terminate bilaterally their contracts with the company; (2) given the right to report for work at their discretion; (3) given discretion as to route selection within a geographic area; (4) no longer required to wear company uniforms or to paint their vehicles company colors; (5) no longer assisted by company warehouse employees in loading their vehicles; (6) no longer required or permitted to report their hours to the company in the same manner as other employees; and (7) no longer required to attend Amber's safety meetings.[9] The

*Duie Pyle, Inc.*, 606 F.2d at 385 n.3; *Lorenz Schneider Co. v. NLRB*, 517 F.2d at 449.

8. In *United States v. Silk*, 331 U.S. 704, 67 S.Ct. 1463, 91 L.Ed. 1757 (1947), the Supreme Court determined in roughly analogous circumstances that owner-operators working for a trucking company constituted independent contractors for purposes of the Social Security Act. Briefly, the drivers there were obligated by contract to haul exclusively for the company; they were required to furnish their own trucks and all necessary equipment and labor, to pay all operating expenses, to furnish fire, theft and collision insurance, and to indemnify the company for any loss caused to it by their actions; they were paid a commission based on a percentage of the tariff charged to customers; company dispatchers issued orders for the truckers' movements although not as to the routes to be followed; and the contract was terminable at any time by either party. The Court concluded:

> [W]here the arrangements leave the driver-owners so much responsibility for investment and management as here, they must be held to be independent contractors .... These driver-owners are small businessmen .... It is the total situation, including the risk undertaken, the control exercised, the opportunity for profit from sound management, that marks these driver-owners as independent contractors.

*Id.* at 719, 67 S.Ct. at 1471. That the Court reached this result is particularly significant in that it applied a more expansive definition of the term "employee" than that applicable here. Relying on its decision in *NLRB v. Hearst Publications, Inc.*, 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170 (1944), the Court rejected "technical concepts" of agency law as the test for employee status and inquired instead whether the drivers should be included within the statutory scheme in light of the legislation's purposes and as a matter of "economic reality." 331 U.S. at 713, 67 S.Ct. at 1468. Congress, in subsequently amending the National Labor Relations Act to exempt "independent contractors" from coverage, specifically intended to overturn *Hearst* and to substitute the narrower principles of agency law as the governing test of employee status. *E. g., NLRB v. United Ins. Co.*, 390 U.S. at 256, 88 S.Ct. at 989; *Local 777, Democratic Union Organizing Comm. v. NLRB*, 603 F.2d 862, 879 n.47, 880 (D.C. Cir. 1978).

Various courts have relied on the *Silk* decision in support of a finding that owner-operator drivers constitute independent contractors. *See, e. g., NLRB v. A. Duie Pyle, Inc.*, 606 F.2d at 387–88; *Merchants Home Delivery Service, Inc. v. NLRB*, 580 F.2d at 975–76. While *Silk* might have persuaded us to reach such a result as an initial matter, it does not compel reversal of the Board's contrary finding here. Not only do several factual distinctions exist, but the result in *Silk* might well have been different— in light of the applicable scope of review—had the Court been reviewing a Board finding that the drivers constituted employees.

9. These findings correspond to allegations contained in the union's unfair labor practices complaint that were specifically admitted by Amber in its answer. Although of no great concern, we note that these findings diverge slightly from the "modifications" which Amber earlier listed—and "represent[ed] ha[d] been implemented"—in its motion for reconsideration. Amber made no mention there of any changes in the drivers' right to refuse loads or in their duty to report their time. Conversely, Amber in its motion did represent that the drivers had been given discretion as to when to load their vehicles and were no longer paid an

Board determined that these changes were motivated by a desire on Amber's part to thwart the drivers' organizing activities and therefore violated § 8(a)(3) and (1) of the Act. For this reason, the Board not only refused to consider the changes in its examination of the employee/independent contractor issue but also ordered them rescinded.

It is clear that Amber is free, in the sincere and justifiable exercise of business judgment unrelated to its employees' union activity, to convert its workers to independent contractors notwithstanding that such action has the incidental effect of excluding these persons from the Act's coverage. It is equally clear, however, that Amber is not at liberty to effect such a conversion, or attempt to do so, as an artifice or device for depriving its employees of their statutory right to union representation. "The conversion of employees to independent contractor status is an unfair labor practice when motivated by anti-union animus." *United Dairy Farmers Co-op. Assoc. v. NLRB*, 633 F.2d 1054, 1063 (3d Cir. 1980). *Accord, e. g., Tonkin Corp. of Calif. v. NLRB*, 420 F.2d 495, 498 (9th Cir. 1969); *General Teamsters, Chauffeurs & Helpers Local 782 v. NLRB*, 373 F.2d 661, 662 (D.C.Cir.), *cert. denied*, 389 U.S. 837, 88 S.Ct. 54, 19 L.Ed.2d 100 (1967); *NLRB v. Kelly & Picerne, Inc.*, 298 F.2d 895, 898 (1st Cir. 1962). *Cf. Textile Workers Union v. Darlington Manuf. Co.*, 380 U.S. 263, 275, 85 S.Ct. 994, 1002, 13 L.Ed.2d 827 (1965) (partial closing of business constitutes unfair labor practice if motivated by purpose to chill unionism in any of employer's remaining plants).[10] Were changes for this sort of reason permissible, an employer might forestall union organizing simply by announcing that, if its employees organize, it will convert them into independent contractors—thus leaving

them, should the threat prove effective, with the worst of both worlds. "The critical fact," as this court remarked in *NLRB v. Kelly & Picerne, Inc.*, "is the underlying motive for the respondent's change of business practice." 298 F.2d at 898.

◼ We find substantial evidence for the Board's finding that Amber instituted the August 9 changes not for legitimate business reasons but for the purpose of forestalling the drivers' union activities. At the unfair labor practices hearing, Amber's president sought to characterize these changes as a continuation of the lawful decision, reached prior to the advent of union activity, to convert the drivers to owner-operators. But, the Board found that the conversion to owner-operator status had been completed in June, at which time no further changes were contemplated; as discussed below, Amber makes no attempt on appeal to justify the changes in terms of business reasons. Rather, we find that Amber's action was undertaken in response to—and in an effort to reverse—the regional director's Decision and Direction of Election issued just eleven days earlier. Amber admitted as much in its motion for reconsideration, stating that "[b]ased upon the Decision and Direction of Election rendered on July 29, 1977, the Employer has made certain modifications in its relationship with its owner operators so that they will be viewed as independent contractors by the Board . . . ." Even more illustrative are comments voiced by Amber's predecessor counsel at the reopened representation hearing, as follows:

[I]t is the Company's intention to make its owner-operators independent contractors as far as this office, the Regional Office, is concerned. And if there is a ruling by the Regional Director that these people, our owner-operators, are

---

hourly wage for occasionally assisting other drivers with loading; these additional changes were not included in the union's complaint or in the Board's findings.

**10.** In the course of discussing an illegal "runaway shop," whereby an employer for antiunion reasons closes a plant and transfers its work to a new or existing plant in another locality, the

Court in *Darlington* noted: "An analogous problem is presented where a department is closed for antiunion reasons but the work is continued by independent contractors." 380 U.S. at 272 n.16, 85 S.Ct. at 1001, *citing, inter alia, NLRB v. Kelly & Picerne, Inc.*, 298 F.2d 895 (1st Cir. 1962).

employees, we will make changes—additional changes—until they become independent contractors as far as the Regional Director is concerned. It's unfortunate that there's no way that the Regional Director of this office can advise a company what steps have to be taken in order to make "employees" independent contractors. But this has been the intent of this employer from day one, prior to the filing of the petition; and this is still the intent of the company.

These statements plainly belie any suggestion that Amber's actions represented an exercise of business judgment divorced from union considerations.

Amber responds, not by attempting to justify the August 9 changes, but by asserting that no changes in fact occurred. It explains that the motion for reconsideration constituted a "representational strategy" devised solely as a means of responding to many alleged factual inaccuracies in the regional director's decision. That is to say, Amber believed that these "changes" described circumstances that—contrary to the regional director's findings—were in existence before August 9. Amber essentially argued: "All right, if you say these circumstances did not exist before August 9, they do now because we have 'changed' our working conditions to incorporate them." Although now acknowledged to have been "clearly ill-advised," this action nonetheless must be viewed, Amber claims, as a "good" reason for its claim that changes were made—a reason unrelated to overt discrimination against union activity.

We agree that several of the regional director's factual findings were otherwise unsupported, see note 5 supra; the record also reveals that many others hinged on credibility determinations largely adverse to Amber. But while the company may have had grounds for complaint concerning

the regional director's findings of fact, making representations that it believed were inaccurate to the regional director was a less than appropriate means of voicing them. We thus have some difficulty with Amber's characterization of its actions as a "good" reason for the changes. In any event, as Amber now concedes, it is "stuck" with its admissions that these various changes were in fact implemented. Given the absence of any proffered business justifications for the changes, and considering the other evidence discussed above and the other unfair labor practices discussed below, we concur in the Board's finding that Amber's actions on August 9 violated the Act.

## IV.

### The § 8(a)(1) Allegations

We turn next to the alleged "employee coercion" violations.[11] As noted above, the union's petition was filed with the regional director on May 11, 1977 and received by Arthur Brussard, the company president, on May 13. On the following Monday, May 16, Brussard called a meeting of drivers at 8:00 a. m. to ascertain what problems had prompted the filing of the petition. Some twelve to fourteen drivers attended. Various problems, including the conversion to owner-operator status and the reduction in customer rates, were discussed. Brussard made no promises or threats to the assembled drivers, but expressed disappointment that their grievances could not have been handled internally and voiced the hope that a union would be unnecessary. Immediately following the meeting, Brussard approached three drivers, named Pitcher, Marra and Griffin, individually and, without requesting any specific action, inquired whether—or indicated that he would appreciate it if—they could "help him out" in any way. These three drivers had earlier been

11. Section 8(a)(1) provides: "It shall be an unfair labor practice for an employer—(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7 . . . ." 29 U.S.C. § 158(a)(1) (1970). Section 7 provides in pertinent part: "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection . . . ." Id. § 157.

identified by Clifford Fales, the company dispatcher, as among the parties chiefly responsible for the petition.

The drivers, assembling later that day, compiled and then submitted to Brussard a list of grievances. Brussard called the drivers into his office on May 18 and, in a brief meeting, rejected their demands across the board; he commented that, once the conversion to owner-operator status was completed, the drivers would no longer be employees and their demands would be irrelevant. At approximately 5:00 that afternoon, Brussard called Pitcher to his office and asked him what he thought of the meeting and why none of the drivers had responded. Brussard also remarked that if the election petition were "pulled" before the hearing the company would save $700 in legal fees. Although this last statement was directed to the terminal manager who was also present, Pitcher testified that he felt it was meant for his ears.

On May 23, a meeting was held between Brussard, Griffin and another driver named Sawyer in the latter's apartment. Brussard had requested the meeting in order to "straighten things out." Under discussion was the possibility of the union withdrawing the petition in return for the company redressing the cited grievances. Brussard specifically requested Griffin and Sawyer to pull the petition. They replied that they might be able to persuade the other drivers to do so if their grievances were met. Brussard promised to attempt to meet at least some of their demands.

■ The Board concluded that the company violated § 8(a)(1) by interrogating Pitcher on May 18 and by soliciting Pitcher, Marra and Griffin on May 16, Pitcher on May 18, and Griffin and Sawyer on May 23 to withdraw support from the union.[12] With one exception, we agree that these actions constitute cognizable—if for the most part borderline—violations of the Act. A finding by the Board of coercive interrogation, based as it must be on an assessment of the entire factual context in which the questioning occurred, *see, e. g., NLRB*

*v. Prince Macaroni Mfg. Co.*, 329 F.2d 803, 806 (1st Cir. 1964), is one in which we typically defer to agency judgment. *See, e. g., NLRB v. Otis Hosp.*, 545 F.2d 252, 256 (1st Cir. 1976); *Corriveau & Routhier Cement Block, Inc. v. NLRB*, 410 F.2d 347, 349 (1st Cir. 1969). Here, the questioning of Pitcher, a known union supporter, was conducted by the company president in his office with one other supervisor present, and occurred on the same day as a drivers' meeting in the midst of a union organizing campaign. Brussard's queries bore no relation to Pitcher's individual activities, but rather were designed to elicit information about the drivers' union sympathies and their reaction to actions of the company. Although such questioning is not *per se* unlawful, *see, e. g., NLRB v. Douglas Division, Scott & Fetzer Co.*, 570 F.2d 742, 745 (8th Cir. 1978), we find sufficient factors here not to disturb the Board's finding that it was unlawfully coercive under the circumstances. *See, e. g., NLRB v. Otis Hosp.*, 545 F.2d at 256–57.

■ Like the interrogation of Pitcher, Brussard's actions in soliciting the "help" of Pitcher, Marra and Griffin involved isolated and fleeting conversations containing no obvious threat of retaliation or promise of benefits. Nonetheless, we cannot fault the Board's determination that such conduct violated the Act in that it was to some degree coercive and "calculated to erode employee support for the union." *NLRB v. Deutsch Co.*, 445 F.2d 902, 906 (9th Cir. 1971), *cert. denied*, 405 U.S. 988, 92 S.Ct. 1248, 31 L.Ed.2d 454 (1972); *accord, General Motors Acceptance Corp. v. NLRB*, 476 F.2d 850, 855 (1st Cir. 1973); *Amalgamated Clothing Workers v. NLRB*, 424 F.2d 818, 824 (D.C. Cir. 1970). Admittedly, the solicitations here did not rival in severity the employers' actions at issue in the cited cases—involving the distribution of, and solicitation of signatures for, form letters expressly disavowing union membership. But even a single oblique remark can be considered unduly coercive in appropriate circumstances. *Com-*

---

12. No impropriety was found in the general meeting conducted by Brussard on May 16.

pare *NLRB v. Pilgrim Foods, Inc.*, 591 F.2d 110, 114 (1st Cir. 1978), *with NLRB v. Rich's of Plymouth, Inc.*, 578 F.2d 880, 884–85 (1st Cir. 1978). Brussard's inquiries here reasonably could have been interpreted as requests for repudiation of the election petition. Coming as they did from the company president on the heels of his receiving that petition, and directed as they were in one-on-one encounters to recognized union sympathizers in a relatively small workforce, these requests can properly be considered violative of the Act. Brussard's comments on May 23, particularly his explicit request that the petition be withdrawn, were obviously even less appropriate. That Griffin and Sawyer may have actively sought—and even initiated—the negotiations with Brussard is unimportant; Amber "was not relieved from its obligations because the employees asked that they be disregarded." *Medo Photo Supply Corp. v. NLRB*, 321 U.S. 678, 687, 64 S.Ct. 830, 834, 88 L.Ed. 1007 (1944); *see, e. g., NLRB v. Pilgrim Foods, Inc.*, 591 F.2d at 116. We disagree, however, that Brussard violated the Act on May 18 by remarking to a third person, in the presence of Pitcher, that withdrawing the petition would save $700 in legal fees. The record provides no grounds for imputing a coercive undertone to this fleeting and undoubtedly accurate comment.

## V.

### The § 8(a)(3) Allegation

█ We next take up the allegation of antiunion discriminatory behavior.[13] On June 3, 1977, call drivers Pitcher, Marra, Griffin, Sawyer and Nicotra reported for work between 7:45 and 8:00 a. m. After loading their vehicles, and in accordance with their customary practice, they visited a diner located approximately one mile from Amber's terminal. For the length of their coffee-break, the drivers were off the air and unable to receive transmissions from Fales, the company dispatcher.[14] Fales testified that, upon receiving several new customer orders, he became concerned about his inability to contact the drivers and suggested to Brussard that they might be at the diner. At approximately 8:30, Brussard drove to the diner and observed all five drivers inside. But rather than speaking with them, he immediately returned to the terminal and instructed Fales to note the time when radio contact was established. When he did succeed in reaching the drivers, beginning at approximately 9:00, Fales made no mention of their diner visit or of his attempts to contact them. At noon that day, Tom Manning, the terminal manager, recommended to Fales that the drivers be suspended. In letters dated June 6, Manning imposed one-day suspensions without pay on Pitcher, Marra and Griffin "for going off the air for a 45 minute period . . . without notifying the Dispatcher." Sawyer and Nicotra, being owner-operators, were not considered employees and thus not disciplined. The Board concluded that these suspensions were motivated by antiunion animus rather than business concerns and thus were violative of § 8(a)(3) of the Act. Amber, emphasizing the time-sensitive nature of its delivery service, protests that the suspensions were both business-related and appropriate to the offense.

In a dual motive case such as this, the initial inquiry is whether the Board has made a *prima facie* showing that a "significant improper motivation" underlay the one-day suspensions. *See Statler Indus., Inc. v. NLRB*, 644 F.2d 902, at 906 (1st Cir. 1981); *NLRB v. Eastern Smelting & Refining Corp.*, 598 F.2d 666, 671 (1st Cir. 1979). Such a showing can rest either on independent evidence of antiunion animus or on the

---

**13.** Section 8(a)(3) provides in pertinent part: "It shall be an unfair labor practice for an employer—(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . . ." 29 U.S.C. § 158(a)(3) (1970).

**14.** The ALJ made no finding as to the length of time spent in the diner. Brussard and Fales testified that the drivers were off the air for approximately one hour, but Pitcher, Marra and Griffin each stated they made their customary ten to twenty-five minute stop.

circumstances surrounding the suspensions themselves. *Id.* at 670. Here, we find the former sufficient to satisfy the Board's initial burden. Amber not only had general knowledge of union activity, *see, e. g., NLRB v. South Shore Hosp.*, 571 F.2d 677, 682 (1st Cir. 1978), but was specifically aware that Pitcher, Marra and Griffin were among the principal union activists. Upon receipt of the election petition, Fales identified these individuals to Brussard as among the parties responsible therefor. And, that Brussard subsequently approached these very three to solicit help underscores his recognition of their key roles in the union campaign. In addition, evidence of improper motivation derives from the various § 8(a)(1) violations discussed above, particularly since they were directed against the same individuals as here. Although not conclusive proof that the suspensions were similarly unlawful, *see, e. g., NLRB v. Prince Macaroni Mfg. Co.*, 329 F.2d at 806, these violations warrant a strong inference of union hostility on the part of Amber. Finally, the timing of the suspensions is important. The decision to discipline these drivers was made three days after the hearing on the representation petition commenced [15]—by which time Brussard had undoubtedly realized that his solicitations of these individuals less than three weeks earlier had been futile. We think these factors suffice to establish a "significant improper motivation" for the suspensions.

The burden therefore shifts to Amber "to prove that it had a good reason, sufficient in itself, to produce" the suspensions. *Statler Indus., Inc. v. NLRB*, at 905, *quoting NLRB v. Eastern Smelting & Refining Corp.*, 598 F.2d at 671. This shift does not impose an overall burden upon Amber of proving itself "innocent" of violating the statute. Rather, Amber must simply come forward with enough evidence to convince the trier of fact that, under the circum-

stances, there is no longer a preponderance of evidence establishing a violation. This it has failed to do. Recognizing the inherent demands of the delivery business, we agree with Amber as a general matter that the drivers' conduct here was of a sort that might reasonably warrant disciplinary action. We cannot agree, however, that Amber has demonstrated that such conduct was the reason for the suspensions in this case, to the point where the inference of unlawful activity (drawn from the evidence of improper motive) is overcome (or, strictly speaking, counterbalanced). Brussard himself conceded that the company not only had knowledge of, but acquiesced in, the drivers' practice of stopping for coffee in the morning. He stated that, although the drivers had been warned [16] about "dallying," it was "fine" if they "wanted to grab a quick cup of coffee." He also acknowledged that no driver ever before had been suspended for being off the air. In an attempt to depict this incident as an unusual and serious occurrence, Amber contended at the hearing that it encountered problems making deliveries and satisfying customer requests as a result of the drivers' actions. But no evidence was introduced that business was lost, that customer complaints were received, or that deliveries were missed or even delayed. And, as the ALJ noted, Brussard's failure to address the drivers at the diner and his request that Fales record the time when contact was established might reasonably be viewed as evidencing "a greater concern for documenting the delay than for expediting pick up and delivery." For these reasons, we think the Board was justified in rejecting Amber's cited justification for the suspensions and in finding a violation of § 8(a)(3).

## VI.

### *The Propriety of the Bargaining Order*

■ Finally, we turn to the relief that the Board ordered. Stressing Amber's "an-

---

15. The hearing was conducted on two days, Tuesday, May 31 and the following Monday, June 6. Amber decided on Friday, June 3 to suspend the drivers and notified them of this action the next Monday.

16. Pitcher, Marra and Griffin each testified, contrary to Brussard's statement, that they had never been warned about stopping for coffee or being off the air. The ALJ failed to resolve this dispute.

tipathy to the collective-bargaining process," the Board concluded that the unfair labor practices had undermined employee free choice to the extent that a free election was unlikely. Consequently, after finding that a majority of the employees had signed valid authorization cards,[17] the Board affirmed the issuance of a bargaining order as a necessary means of protecting employee sentiment. Although fully cognizant of the deference normally accorded to the Board's expertise in fashioning remedies, *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 612 n.32, 89 S.Ct. 1918, 1939, 23 L.Ed.2d 547 (1960); *NLRB v. Pilgrim Foods, Inc.*, 591 F.2d at 120, on this point we differ.

The interrogation and the various acts of solicitation constituted borderline violations having minimal impact on the election process. Brussard made no threat of reprisal and exerted no direct coercion at any time. His only unambiguous requests and promises were voiced at the May 23 meeting to individuals who—far from being intimidated—actively sought and possibly initiated the negotiations. Moreover, Pitcher, at whom Brussard's actions seemed principally directed, is no longer in Amber's employ.[18] The one-day suspensions, of course, were not borderline violations of the Act. And, as the Board notes, the fact that they occurred at the height of the union campaign undoubtedly magnified their coercive effect, particularly given the small size of the employee unit. *See, e. g., Ann Lee Sportswear, Inc. v. NLRB*, 543 F.2d 739, 744 (10th Cir. 1976). Nonetheless, these actions were neither severe nor permanent. And again,

Pitcher, one of the three drivers suspended, is no longer an employee. In *Pilgrim Foods*, we vacated a bargaining order involving an eight-member employee unit notwithstanding that the employer had unlawfully cancelled a scheduled wage increase, solicited and promised to remedy grievances, threatened reprisals, and discharged an employee. 591 F.2d at 114–20. The one-day suspensions at issue here plainly provide less warrant for this "extreme" remedy. *NLRB v. Matouk Indus., Inc.*, 582 F.2d 125, 130 (1st Cir. 1980).

In justifying its order, the Board places principal reliance on the August 9 changes in working conditions and the statements made by Amber's former counsel in connection therewith. However, we fail to see how these actions have irrevocably tainted the election machinery. Admittedly, Amber's attempt to counteract the regional director's finding of employee status evidenced a hostility toward the union.[19] But the record makes clear that Amber hit upon this device, not because it was out to "get" the union "at all costs," but rather because it mistakenly believed that these changes (or at least the alleging of these changes) provided a lawful method of demonstrating that the employees did not qualify for union status. Now that it is plain that they do so qualify, we see no reason in the record for believing that Amber's past conduct, or its likely future conduct as evidenced by its past actions, would prevent an election from properly manifesting the uncoerced will of the majority. The Board points to

---

17. The Board found that, as of May 11 when the election petition was filed, nine of the seventeen drivers then employed by Amber had signed valid authorization cards designating the union as their collective-bargaining representative. Amber advances several challenges to this finding of majority status, which we reject.

18. Pitcher was one of the four drivers lawfully discharged on June 15 for failing to convert to owner-operator status. It should be noted that the discharge of these drivers dissipated the union's card-based majority status. Although this fact does not preclude issuance of a bargaining order, *see, e. g., United Dairy Farmers Co-op. Assoc. v. NLRB*, 633 F.2d at 1069, it is a

relevant factor bearing on the propriety of such an order, *see, e. g., NLRB v. Jamaica Towing, Inc.*, 632 F.2d 208, 214, 216 (2d Cir. 1980); *Chromalloy Mining & Minerals Alaska Div. v. NLRB*, 620 F.2d 1120, 1132–33 (5th Cir. 1980), and it reinforces the conclusion we reach here.

19. Dislike of unions, of course, "is not uncommon among employers." *NLRB v. Eastern Smelting & Refining Corp.*, 598 F.2d at 670. It should also be noted that Amber had good reason for its initial lack of enthusiasm for the union campaign. As is evident from our discussion of this issue, Amber reasonably could have believed that the lawful change to owner-operator status had also worked a conversion of its drivers to independent contractors.

the promise of future action voiced by Amber's counsel as evidence that the unfair labor practices are likely to recur. Given the unusual candor of these comments, arguably the more supportable inference is that Amber, or at least its counsel, failed to appreciate the unlawfulness of the proposed changes. We do not see how these statements, examined in the context of the entire record, evidence an intention on Amber's part to disobey the subsequently imposed cease and desist order. Even if they can be considered an accurate reflection of Amber's frame of mind at that time, counsel's comments neither mentioned nor implied future retaliation or other coercive measures. Nor does an expressed intent to seek to change the status of employees to bring them out from under the Act obviously or necessarily imply an intent to interfere later with their subjective freedom of choice. In these circumstances, we think the holding of a fair election—which constitutes the "preferred" method of determining a bargaining unit's representative, *NLRB v. Gissel Packing Co.*, 395 U.S. at 602, 89 S.Ct. at 1934—remains a viable option.

*Enforced in part and vacated in part.*