NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

MAINE CATERERS, INC., et
al., Respondents.

Brotherhood of Industrial Caterers,
Intervenor.

No. 80–1778.

United States Court of Appeals,
First Circuit.

Argued June 1, 1981.

Decided July 16, 1981.

---

James Y. Callear, Atty., with whom William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel and William Wachter, Atty., Washington, D. C., were on brief, for petitioner.

Amato A. DeLuca, Warwick, R. I., with whom Revens & DeLuca, Ltd., Warwick, R. I., was on brief, for respondents.

Before COFFIN, Chief Judge, CAMPBELL and BREYER, Circuit Judges.

BREYER, Circuit Judge.

The sole issue in this case is whether a group of "driver-salesmen" are employees or independent contractors. The National Labor Relations Board found that they were employees. We agree and enforce the Board's order.

The respondents are two closely related industrial caterers. One of them, Maine Caterers, Inc., makes meals, sandwiches, coffee, and similar items for sale at industrial plants during lunchtime and coffee breaks. The other respondent, W. H. Maine, Inc., leases trucks and customer routes to driver-salesmen who sell Maine Caterers, Inc. products. These driver-salesmen voted nine to one to be represented by a union. The Board found that, for purposes of collective bargaining, the two companies constituted one employer ("Maine"),[1] and it ordered Maine to bargain. We find sufficient evidence in the record to support the Board's conclusion.

The result in this case flows directly from two of our cases: *Seven-Up Bottling Co. v. NLRB*, 506 F.2d 596 (1st Cir. 1974), and *NLRB v. Amber Delivery Service, Inc.*, 651 F.2d 57 (1st Cir. 1981). Most recently in *Amber* we stated the relevant principles of law as follows:

It is well-established that general principles of agency law govern the distinction between employee and independent con-

tractor for purposes of the Act. *E. g., NLRB v. United Ins. Co.*, 390 U.S. 254, 256 [88 S.Ct. 988, 989, 19 L.Ed.2d 1083](1968); *Seven-Up Bottling Co. v. NLRB*, 506 F.2d 596, 597 (1st Cir. 1974). The House Report on the legislation specifically excluding "independent contractor" from the definition of "employee" outlined this distinction as follows:

"Employees" work for wages or salary under direct supervision. "Independent contractors" undertake to do a job for a price, decide how the work will be done, usually hire others to do the work, and depend for their income not upon wages, but upon the difference between what they pay for goods, materials, and labor and what they receive for the end result, that is, upon profits. H.R.Rep.No.245, 80th Cong., 1st Sess. 18 (1947), *reprinted in* 1 Legislative History of the Labor Management Relations Act, 1947, at 309 (1948). Thus the Board, in applying the common law test of independence, has looked to the right of control: whether the putative employer has the right to control not only the results sought but also the means by which those results are achieved. *E. g., Merchants Home Delivery Service, Inc. v. NLRB*, 580 F.2d 966, 973 (9th Cir. 1978); *Seven-Up Bottling Co. v. NLRB*, 506 F.2d at 597–98; *News Syndicate Co.*, 164 N.L.R.B. 422, 423 (1967). It has also looked to the risk of loss and opportunity for profit and to the degree of "proprietary" interest in, for example, a route or dealership. *E. g., Brown v. NLRB*, 462 F.2d 699, 705 (9th Cir.), *cert. denied*, 409 U.S. 1008 [93 S.Ct. 441, 34 L.Ed.2d 301] (1972); *El Mundo, Inc.*, 167 N.L.R.B. 760, 761 (1967); R. Gorman, Basic Text on Labor Law 30 (1976). The determination of "independence", however, ultimately depends upon an assessment of "all of the incidents of the relationship . . . with no one factor being decisive." *NLRB v. United Ins.*

---

[1]  Both companies are owned and controlled by William Maine with the assistance of his brother, Henry. Respondents have not challenged the Board's finding that Maine Caterers, Inc. and W. H. Maine, Inc. constitute a single employer for purposes of Board jurisdiction. *See*

*Radio & Television Broadcasting Technicians, Local 1264 v. Broadcast Service of Mobile, Inc.*, 380 U.S. 255, 256, 85 S.Ct. 876, 877, 13 L.Ed.2d 789 (1965). For convenience, respondents are collectively referred to as "Maine".

Co., 390 U.S. at 258, 88 S.Ct. at 990, *see* Restatement (Second) of Agency § 220 (1957). Our task on review is to ascertain whether the Board's evaluation of such factors is "supported by substantial evidence when viewed in light of the entire record, including the evidence opposed to the Board's position." *Seven-Up Bottling Co. v. NLRB*, 506 F.2d at 600. So long as the Board's position represents a "choice between two fairly conflicting views", it should be enforced even if this court "would justifiably have made a different choice had the matter been before it *de novo.*" *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed.2d 456 (1951), *quoted in NLRB v. United Ins. Co.*, 390 U.S. at 260 [88 S.Ct. at 991].

*Id.*, at 60–61.

There is considerable evidence here that Maine has the "right to control not only the results sought but also the means by which those results are achieved". *Id.*, at 61. The salesmen are first trained as salaried drivers. Henry Maine, one of Maine's owners, shows them "exact procedures" for running a Maine catering truck. These include the time to appear at each stop, the method of display, the manner to use with customers, and the proper method of driving. After training, the driver is no longer salaried, but Maine continues significant supervision. Maine does not allow use of the truck for other than serving Maine customers. Maine may add or subtract particular customers to or from a driver's route. Maine coordinates the time of serving any added customers with the driver's existing schedule. Maine supervises the driver's maintenance of the truck and its cleanliness. There is evidence that, at times, Henry Maine accompanies a driver on his route, checking the driver's stops and times, the driver's prices, the manner of food display, and the way in which the driver presents himself to the customers. Henry Maine has at times visited customers to settle problems. The written contract between the driver and Maine requires the driver to serve his entire route each business day and forbids him from deviating from the route or omitting services. It forbids him from serving anyone other than Maine's customers. It requires him to buy all "food, beverages, supplies and sundries" from Maine. And, Maine's interest in the manner of route service is enforced by the fact that the contract allows Maine (as well as the driver) to terminate the contract for any reason upon thirty days notice.

If one looks to "the degree of 'proprietary' interest in . . . a route," *id.*, one finds that the driver has no interest whatsoever in his route. All routes are the property of Maine. Any additional customers found by the driver become the property of Maine. And, under the contract, should the driver leave Maine's service, he could not engage in industrial catering in Rhode Island for two years.

The major difference from *Amber* arguably lies in the area of "risk of loss and opportunity for profit". Unlike in *Amber*, the drivers here allegedly sell at prices set, not by Maine, but by themselves. They buy their supplies from Maine and resell them; thus they bear the risk of bad debts, spoilage, and theft. Moreover, their compensation comes from the difference between their purchase price and their resale price. Maine does not pay them salaries or provide fringe benefits or withhold taxes or social security. The drivers also have the right to hire substitutes—though there is evidence that the substitutes had to meet with Maine's approval.[2]

These factors are not controlling, however, for two reasons. First, there is evidence that the drivers' control of prices was limited. The contract provides that the driver "shall set the products purchased by him at reasonably competitive prices as suggested by [Maine] from time to time". Maine prints menus with prices, which are distributed to customers and posted on the trucks. Since a customer may be served by more than one driver-salesman during the course of the day, Maine is particularly interested in keeping prices uniform. Henry Maine has told at least one driver to reduce a price that he was charging on an

---

2. And in both cases the contract provides that no employer-employee relationship exists.

item. Driver Michael J. Grady testified concerning Henry Maine's supervision and the "strongly suggested" prices:

> Sometimes [Henry Maine] would come along with me because I would ask him to come along. And, other times he would request it for what appeared to me to be supervisory reasons, such as: he would stand there and he would check my totals—if I was totaling a particular group of food that a customer was buying. He would sample my food. Check my appearance and make sure my truck was in proper operating procedure. He would make suggestions as to how I should improve it or change my operation around.
>
> Q. Did he ever tell you that you were charging too much for your goods?
>
> A. At times....
>
> ....
>
> Q. Now, can you explain to us, in your own mind did you feel that these suggestions were such that if you didn't follow them, you might be terminated?
>
> (After an objection, which was overruled.)
>
> A. Yes.
>
> Q. Why did you feel that way?
>
> A. Because of a combination of—it was strongly suggested and you would go along with the suggestion. If you don't go along with the suggestions—okay? You run into a certain problem—it would always exist.
>
> In other words, you would feel—I would feel, personally, like you were running into a confrontation constantly if you didn't do that.
>
> In particular circumstances, if I objected strongly to a particular price or something—then personal conversations that existed on a day to day basis would cease—if that's clear?

Second, and more important, here, unlike in *Amber* and *Seven-Up*, the drivers did not own their trucks.[3] They leased the trucks, paying for their gasoline and other maintenance. In *Amber* and *Seven-Up*, we found the fact of truck ownership a significant (though not in itself controlling) factor suggesting independent contractor status. This is not surprising, for a driver who owns a truck has more than his own labor at risk—he also has a capital investment. And, this investment gives him somewhat greater independence (in terms of his ability to find work elsewhere) than were only his own labor at stake. The fact of nonownership alone, tending to support a finding of "employee", more than outweighs any minor differences that Maine contends cut in the other direction.[4]

On the basis of this prior authority, the order of the Board is

*Enforced.*

---

3. The trucks bear the inscriptions "Serviced by Maine Caterers" and "operated by [driver's name]".

4. Maine seeks to distinguish *Seven-Up* on the grounds that, in contrast to this case, the contracts in *Seven-Up* were oral, Seven-Up billed customers directly, many Seven-Up drivers wore uniforms, Seven-Up set sales quotas, Seven-Up had meetings to discuss sales, Seven-Up conducted surveys to evaluate the distributors, and Seven-Up controlled the size of the territories. The record suggests that as to many of these items, the differences between Seven-Up and Maine are small. As to the others, we believe any differences are outweighed by the fact that in *Seven-Up*, many drivers owned their own trucks, yet we still upheld a Board finding of "employee" status. Here the drivers do not own their trucks.